## LOUIS SCHOPPER & FOREIGN PAPER MILLS, Inc., v. STAR BRASS MFG. CO.

District Court,. D. Massachusetts.   September 17, 1929.

No. 2943.

Stockbridge & Borst, of New York City, and Everett S. Emery and Emery, Booth, Janney & Varney, all of Boston, Mass., for plaintiff.

Harry Dexter Peck, of Providence, R. I., for defendant.

MORTON, District Judge.   This is a suit for infringement of patent to Riegler, No. 1,193,613, dated August 8, 1916; application filed September 8, 1913. It was heard in open court on oral and documentary evidence. The plaintiff's title is admitted.

The facts are as follows: The stock of which paper is made undergoes in the paper-making machine a process called "beating." The effect of beating, carried to the proper point, is to make the paper much stronger; but, if carried too far, weakness results. It is therefore necessary to stop the beating at the right stage. As the appearance of the stock furnishes no guide on this point, the beating was formerly controlled by mere guesswork, or by the feeling of it, or by dipping out stock from time to time and making test sheets of paper—methods which were far from satisfactory. In 1910, Skark in Germany published in "Der Papier Fabricant," a trade journal, an article on the relation between the condition of the pulp as respects beating—its "fineness," so called—and the rapidity with which the water of suspension drained from it, that the finer the pulp, the slower the water left it; and he published sketches of a simple machine for utilizing this relation in the manufacture of paper. The rate at which the pulp loses its water of suspension is called the "freeness" of the stock.

This discovery of the relation between freeness and beating opened the way to much simpler methods of determining when the beating had been carried far enough. Freeness is easily tested by pouring the liquid stock on a screen, generally of fine copper wires. The stock being over 99 per cent. water, there is at first a rush of water through the screen. As the pulp fibers accumulate thereon, they clog the passage of water. The last of the water drips slowly from the matted pulp. All this was well understood in the art before the application for the Riegler patent. Suitable instruments had been devised to take advantage of it in the operation of paper-making machines. For instance, Skark in 1911 published a description of a simple machine which made a graphic curve of the rate at which the water left the stock; one side being time, and the other, units of flow.

Riegler was the first to see that it was possible to get all necessary information about the condition of the stock for the purpose stated in a much simpler way, by merely separating the freeness water, which came through the screen when the stock was first poured upon it, from that which more slowly drained from the pulp—the coarser the stock, the greater the relative amount of freeness water, and vice versa. He therefore arranged below the screen a receptacle which had a small outlet at the bottom and a larger outlet on the side higher up. When stock is first poured into this tester, the flow of water greatly exceeds the capacity of the bottom outlet. The water rapidly fills the container to the side outlet and escapes thereby. As the fibers accumulate on the strainer, the flow is slowed down to an amount which can be taken care of by

the bottom outlet. By collecting separately the freeness water which passed through the side outlet and the other water which passed through the bottom outlet, Riegler having calibrated the instrument was able to determine the condition of the stock with respect to freeness, and thereby with respect to beating. His method, which eliminates the troublesome element of timing the flow, proved extremely simple, quick, and serviceable, well adapted for use in paper-making mills. In practical use it has superseded all others. It originated with him. There is no suggestion of it in the prior art. His patent is a pioneer patent of much merit in the narrow field to which it relates.

The defendant's apparatus unquestionably embodies the Riegler principle and is designed on substantially the same lines as the Riegler apparatus.

There is, however, this difference between them: In the Riegler apparatus the water from each outlet is collected in separate vessels, and the stock is judged by the relative amount in each; while in the defendant's apparatus only the water from the larger opening—the freeness water—is collected, and the determination is made by the proportion between it and the total amount of stock which went into the hopper. In other words, Riegler does not measure the amount of stock which goes into the hopper, but gets his results by comparing the amounts of water which pass through the two openings, while the defendants measure the amount of stock put into the hopper and compare it with the amount of water which passes through one opening. The underlying idea is precisely the same, and the Riegler apparatus can be used in this way without any change.

The difficulty with the case is due to the fact that Riegler appears not to have thought of using his tester in this latter way. His patent seems to have been drawn upon the supposition that the water from both outlets would be collected and the amounts compared. Some of the claims, certainly—the defendant says all of them—include as an element means for collecting (in the sense of gathering together for the purpose of measurement) the water from *both* outlets. This is true of the second claim, which includes "independent collecting vessels," of the fifth, which includes "a collecting vessel in communication with each

of said outlets," and the sixth, which includes "independent collecting vessels for each outlet." However meritorious a patent may be, elements explicitly included in a claim cannot be ignored. As was said in American Roll Gold Leaf Co. v. Coe Manufacturing Co. (C. C. A.) 212 F. 720, 724, an infringement suit is not a reissue proceeding. Even under the most liberal rules of construction, I do not think that a waste pipe can be regarded as a "vessel." These claims are not infringed.

Other claims are, however, more broadly drawn. In the first, the corresponding element is stated as "independent means for collecting the constituents passing from each of the outlets of the bottom wall of the container," in the third, as "a collection means in communication with said outlets," and in the seventh, "collecting means arranged below said outlets."

In these latter claims there is no reference to collecting "vessels." The broader expression, "collecting means," was suggested by the examiner in his communication of October 15, 1915. The claims which include it are to be read with this difference in mind. In them this element can, I think, fairly be construed, in accordance with the obvious intention of the patent, as means for keeping the water from the two outlets separate so that the amounts can be measured as far as necessary for the purpose of the test. There is nothing in the proceedings in the Patent Office which precludes such a construction. The merits of this case are entirely with the plaintiff; and it is a familiar and established principle that the claims of a meritorious patent are, if possible, to be so construed as to protect the inventor. Eibel Process Company v. Minn. & Ont. Paper Company, 261 U. S. 45, 63, 43 S. Ct. 322, 67 L. Ed. 523. In the Gold Leaf Company Case above referred to, the word "automatically" was used in every claim in suit in connection with a certain operation of the machine. In the defendant's machine this operation was performed by hand. It was held that "automatically" could not be construed to cover manual operation. The principle above stated was fully recognized in that decision.

Let there be a decree that claims 1, 3, 4, and 7 are each valid and infringed, and for an injunction and accounting, and that the remaining claims are not infringed. Costs to the plaintiff.