## NEW YORK TRUST CO. v. ISLAND OIL & TRANSPORT CORPORATION et al.

### No. 143.

Circuit Court of Appeals, Second Circuit.

Feb. 1, 1932.

Chadbourne, Hunt, Jaeckel & Brown, of New York City (William M. Chadbourne, Howard H. Brown, John M. Wood, and Alfred H. Phillips, all of New York City, of counsel), for appellants.

Kohlman, Austrian & Lance, of New York City (Francis L. Kohlman and Saul J. Lance, both of New York City, of counsel), for receivers.

Martin Conboy, of New York City (David Asch, of New York City, of counsel), for Oil Transport Co. and Sun Oil Corporation, General Creditors.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Appellants seeks a review of the order of the District Court which reversed a determination of a master who held that they, subsidiaries of the Island Oil & Transport Corporation, were entitled to an accounting of the funds and assets which came into the hands of the receivers of the Island Oil & Transport Corporation. Each appellant, except one, was a corporation organized under the laws of the republic of Mexico, and the stock of each, excepting the directors' qualifying shares, was owned by the transport company, a Virginia corporation. One of the claimants, the Antillian Corporation, was a Delaware corporation; two-thirds of its outstanding stock being held by the transport company and one-third by outside interests. The appellants were engaged in the business of producing and transporting oil. Capuchinas was vested with the ownership of leases of, or direct title to, the oil-producing properties in Mexico; Oleoductos owned a pipe line and storage facilities in Mexico; Nayarit owned some oil-producing properties in Mexico; Transportes owned facilities for water transportation, including barges and lighters; Antillian held leases to properties in Cuba.

On June 15, 1921, the transport company made a trust agreement with the New York Trust Company, as trustee, to secure an authorized issue of five million 8 per cent. and participating secured gold notes. Under this agreement substantially all the stocks of these claimants, with the exception of one-third of the stock of the Antillian Company belonging to third parties, were pledged as security for payment of the notes. There are outstanding $4,136,000 face amount of such notes.

The trust agreement provided, section 2, art. 5, that until default the transport company shall receive all dividends out of earnings on the stock, notwithstanding the same may have been transferred into the name of the trustee or its nominees; that the trustee upon request shall deliver to the transport company orders in its favor for the payment of such dividends, and the transport company may collect such dividends, and the trustee shall, upon payment, pay over to the transport company any dividends paid to or collected by it; these orders shall be revocable upon any default by the transport company. It is provided that the transport company shall not be entitled to receive dividends upon the capital stock of any of the companies upon dissolution or liquidation of such companies, and that the transport company shall not sell, assign, or transfer any dividends, but until paid shall remain subject to the agreement.

Article 5, § 5, provides: "In case one or more of the events of default * * * shall have occurred * * * the Trustee shall be entitled in its absolute discretion to exercise or cause to be exercised for the sole or exclusive benefit of the holders of the Notes * * * all the rights of an owner of said shares of stock * * * without restriction of any sort, anything herein contained to the contrary notwithstanding, and to exercise, or cause to be exercised, the voting power of said stock in its absolute discretion and shall collect the dividends on said stocks. * * *"

Section 2, article 6, provides that in the event of any default, the trustee shall be entitled to revoke all instruments executed by it enabling the transport company to collect dividends on the stocks, and the trustee for the benefit of the holders of the notes shall receive and collect all dividends payable on the stock. All sums received by the trustee as dividends, after deducting all charges, costs, and expenses, including attorney's fees, are to be applied by the trustee, if the principal shall not have become due, to the pro rata payment of coupons in default in order of maturity of such coupons with interest at the rate of 8 per cent.; such payments to be made without distinction or preference. If the principal is due, the dividend sums shall be applied to the payment of the whole amount due and unpaid upon the notes outstanding, and all due and unpaid interest coupons and interest and participating payment coupons at the rate of 8 per cent., and, if the sums received are insufficient for this purpose, payment of the whole amount shall be made proratably according to the aggre-

gate of such notes and coupons due and unpaid, without preference or priority.

On March 20, 1922, receivers were appointed for the Island Oil & Transport Corporation and also for the Island Oil Marketing Corporation, a Delaware corporation, which marketed the oil products. The receivers were appointed on a general creditors' bill. By the terms of the trust agreement, the appointment of receivers was an event of default. Moneys for which these claims are presented were obtained from the operation of the claimant companies by the receivers after such default. On April 7, 1922, the trustee declared, by virtue of section 1, art. 6, of the agreement, that the principal and premium of the outstanding notes were due and payable and made demand for payment. Payment has not been made. Notice was thereupon served that the noteholders and trustee were entitled to and would exercise the rights conferred by the agreement because of such default, and that the powers conferred by the powers of attorney theretofore given were not to be further exercised without the approval of the trustee. On April 7, 1922, a foreclosure suit to cause the sale of the pledged stock was begun. The receivership in the creditors' suit was extended, for the protection of the trustee upon its application, to the proceeds of the subsidiary companies. The receivers continued the operation of the business. The rights of creditors of the parent corporation and these subsidiaries were reserved for further determination. The order entered provided that the receiver should keep separate accounts of the moneys received from the sale of all oil produced by the Mexican subsidiaries, credit such subsidiaries with the proceeds, and charge them with the moneys spent for their account. The receivers actually segregated and kept separate accounts for the proceeds derived from the properties of the subsidiaries.

From time to time the trustee, at the request of the receivers and upon authorization of the receivers by the court, gave proxies to vote the pledged stocks, which rights were vested in the trustee after default. Whenever such consent was given to the receivers by the trustee, limitations were imposed that nothing be done or authorized in contravention of the terms of the trust agreement. A sale in foreclosure of the pledged stock was held on June 19, 1923. A committee of note holders became the purchasers of the pledged stock at the foreclosure sale. The trust agreement constituted a valid pledge of the stocks of the subsidiaries. New York Trust Co. v. Island Oil & Transport Co., 33 F.(2d) 104 (C. C. A. 2).

We considered the claims advanced as to ownership of the proceeds from the sale of oil produced by the subsidiaries before default had occurred, and held that such proceeds were the property of the transport company; that it could control the affairs of the subsidiaries by voting the pledged stock. New York Trust Co. v. Island Oil & Transport Corp. (C. C. A.) 34 F.(2d) 655.

The question now presented is the ownership of the proceeds of the sales made after default had occurred. While the subsidiaries were each, with the exception of the Antillian Company, Mexican corporations, they were organized for the purpose of complying with the laws of Mexico relating to the manner in which oil properties might be held in that country. We said in 34 F.(2d) 655:

"It [transport company] held all the shares of stock in these [the subsidiaries], except such as were necessary to qualify the directors, and conducted the business directly, either in New York or Tampico, by means of its own officers under the supervision of its directors. The Mexican officers of these companies had no voice whatever in its affairs, decided nothing, and were not consulted by the parent company.

"Nevertheless books of account were kept between the subsidiaries and the parent, showing apparent sales and payments, and in general a complete simulacrum of real transactions."

In any event, they were all legally organized and existing corporations. The directors were residents of Mexico and were individuals other than officers and directors of the transport company. They met in Mexico and elected the corporate officers. All officers were residents of Mexico. They appointed attorneys in fact for the corporation, and the business of the corporation in Mexico was conducted through the attorneys in fact so appointed, in accordance with the custom and approved policy. A general manager was usually appointed attorney in fact. He represented the several subsidiaries, having such authority as was derived from the powers of attorney given to him. This included the power "to carry out all kinds of transactions which the board of directors could make." The oil-producing properties and leases all stood in the name of the subsidiaries.

The trust agreement, by the phrase quoted above, provided that after default no dividends should be declared by the corporation

unless such dividends were paid to the trustee for the benefit of the note holders. Prior to default, the transport company had the right as against note holders to appropriate to itself the revenues of the subsidiaries, but that right ceased upon a default occurring. If, after default, the transport company had a right to appropriate the income to itself, the provision that all dividends after default were to be paid to the trustee would be meaningless. Dividends must necessarily be paid out of earnings. The general creditors of the transport company can look only to the property of that company for the payment of their claims. When property rights of the transport company in the subsidiaries ceased, upon default in the trust agreement, at that time the rights of the creditors to follow the transport company's property ceased. The appointment of receivers did not change the parties' contract rights and obligations. Odell v. Batterman, 223 F. 292 (C. C. A. 2); Park v. N. Y. Ry. Co. (C. C.) 57 F. 799. And the rights of the general creditors of the transport company to the properties of the subsidiaries are restricted by covenants and promises of the transport company in the trust agreement. Examples of these restrictions are found in its covenants that it will not allow any subsidiary whose stocks were pledged to mortgage its property; that, if any of the property be taken by eminent domain, the proceeds, or property of equal value, shall be substituted under the pledge. The capital assets of the subsidiaries were to be held intact to protect the value of the pledged stock. The transport company at no time had the right to receive dividends representing the liquidation of capital assets, and its right to receive dividends representing earnings ceased upon the occurrence of a default. The value of the physical property at the time of the foreclosure sale was nominal without the value of the oil produced between the occurrence of the default and the foreclosure sale. But under the trust agreement the parent company had the right to income from the sales of the oil until default occurred. Therefore, when receivership intervened and default occurred, equity required that the corporations keep separate and distinct their accounts and properties, and this was done under the direction of the court. The funds and assets received from the Mexican subsidiaries including two-thirds of the funds of the Antillian Company in the hands of the receiver should be held for the benefit of the trustee and of the note holders as the property of these independent corporations.

Nor are the note holders or trustee necessary parties in presenting and enforcing these claims. Wathen v. Jackson Oil & Refining Co., 235 U. S. 635, 35 S. Ct. 225, 59 L. Ed. 395; Hodge v. Meyer, 252 F. 479 (C. C. A. 2); Cream City Co. v. Coggeshall, 142 Wis. 651, 126 N. W. 44, 135 Am. St. Rep. 1091. Between the time of default and the foreclosure sale, the income belonged to the subsidiaries and constituted part of the value of the pledged stock. The moneys received during this period necessarily were for the benefit of the subsidiaries and constituted their property. The corporation could not be deprived of this property.

The noteholders committee which purchased the stocks at the foreclosure sale represented 82 per cent. of those outstanding notes, and provision was made by the court that the remaining 18 per cent. have protection.

It is clear that the subsidiaries from the date of default insisted that an accounting be had of the proceeds after default. As soon as default occurred, the transport company and its representatives lost the position of controlling stockholders, and the trustee took its place. After the default, it was the intention of the trust agreement that the post default revenues of the subsidiaries should be preserved to the companies which produced them for the benefit of the note holders. In no way were the events of the default remedied or waived. Pursuant to the terms of the trust agreement, the trustee wrote to the attorneys in fact of the subsidiaries in Mexico referring to the pledge of stock and demanded that from that time on the rights of the trustee be preserved, and it was stated that the trustee and note holders intended to exercise such rights, powers, privileges, and remedies as the agreement provided. Foreclosure followed, and the rights now claimed were asserted in the bill of foreclosure and the prayer for relief.

It thus appears to have been the intention of the parties that, while the transport company considered all leases and properties of the subsidiaries as its own in the operation of its business, its rights of property rested solely on the medium of stock ownership. It did not mortgage the physical property; only the subsidiaries could have done that. Gibbons v. Mahon, 136 U. S. 549, 10 S. Ct. 1057, 34 L. Ed. 525; Eichelberger v. Arlington Bldg., Inc., 52 App. D. C. 23, 280 F. 997. Of course, stockholders are not tenants in common of the corporate property and have no title as such to the corporation's property. It is essential to keep title to corporate

property free from complications and uncertainty. Therefore the corporation is treated as a collective entity without regard to its individual shareholders. It requires corporate action to sell, mortgage, or otherwise dispose of the corporate property. The shares of stock held by these subsidiaries are not appurtenances to the parent corporation, but property owned by it. The Antillian Company, in which the transport company owned but two-thirds of the stock, is in no more of an independent status, and illustrates the necessity of having due regard for separate entities in the event of payment of dividends, ownership of property, or dissolution.

Where, as was done here, under the terms of the trust agreement when default occurred, the trustee for the benefit of the note holders, in its absolute discretion, exercised rights of ownership to the stock and persisted in asserting them, the pledged stock and with it the corporations became owned by the note holders and ceased to be the property of the transport company; the only rights left to the transport company after default were to recapture the pledged stock by paying the full amount due on the notes for principal and interest, or to redeem the stock.

Under the terms of the agreement and in good conscience, it must be held that the stock of the subsidiary corporations passed to the trustee for the note holders on default and ceased to be the property of the transport company, since ownership was asserted by the trustee as permitted under the terms of the agreement. The earnings of the subsidiaries from the time of default remained the property of these corporations for the benefit of their shareholders.

The decree must be reversed, and the report of the master confirmed.