709 F.2d 1241
 2 Soc.Sec.Rep.Ser. 219
 UNITED STATES of America, Plaintiff-Appellee,
v.
CALIFORNIA CARE CORPORATION, dba Sunray East Convalescent
Center, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
EL RIO DEVELOPMENT COMPANY dba Sunray North Convalescent
Hospital, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
EUCLID CONVALESCENT CENTER, INC., Defendant-Appellant.
 Nos. 82-4150 to 82-4152.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 10, 1983.
Decided May 24, 1983.
As Modified on Denial of Rehearing July 5, 1983.
 
 Stephen A. Shefler, San Francisco, Cal., for plaintiff-appellee.
 Louis E. Goebel, Goebel & Monaghan, San Diego, Cal., for defendant-appellant.
 Appeal from the United States District Court for the Northern District of California.
 Before GOODWIN and SNEED, Circuit Judges, and JAMESON*, District Judge.
 SNEED, Circuit Judge:
 
 
 1
 This appeal is brought by three health care providers, Euclid Convalescent Center, California Care Corporation, and El Rio Development Company. Each of the providers operated a convalescent home in California in the late sixties and received funding under the Medicare Act, 42 U.S.C. Secs. 1395-1395rr. The government, following a lengthy administrative process, sued in the district court for return of payments advanced to the providers for the 1967, 1968, 1969, and 1970 cost-reporting years. The claimed overpayments exceeded one million dollars. The district court decided for the government and the providers appeal. We affirm.I.
 
 
 2
 THE ADMINISTRATIVE PROCEEDINGS AND THE QUESTIONS ON APPEAL
 
 
 3
 The last Medicare payment contested in this case was received by the providers more than ten years ago. We must decide whether they are entitled to continue to hold this and earlier payments while pursuing still more administrative proceedings. To decide this we must set forth the process that has brought the providers this far.
 
 
 4
 The extent of claimed overpayments to the providers was established in audits conducted by Blue Cross in 1972 and 1973. Blue Cross was the intermediary appointed by the Bureau of Health Insurance, then a division of the Department of Health, Education, and Welfare, to manage Medicare payments to the providers. As a fiscal intermediary, Blue Cross advanced per diem payments to the providers based on the latters' cost estimates. At the end of each cost-reporting year Blue Cross conducted a final audit and adjusted payments to reflect actual costs. 42 U.S.C. Secs. 1395f-1395h; 20 C.F.R. Sec. 405.454 (1975).[1] The providers had received notice of the audits for all three homes by June 15, 1973.
 
 
 5
 The attorney who represented the providers wrote Blue Cross on June 4, 1976, contesting every adjustment Blue Cross had made and asking to appeal.[2] He stated his
 
 
 6
 intent to assert on behalf of the provider any and all claims with regard to reopening for any purpose appeals with reference to final settlements or interim reports or anything else of any kind that may exist in the record so as to reinsure to the above facility its administrative remedies.
 
 
 7
 Blue Cross on June 8 requested specification of the date and amount of each contested payment as well as the attorney's statutory or regulatory support for resisting repayment. It also requested a response in twenty days and appended a copy of its Medical Provider Appeals Procedures, which would govern the appeal. Even though Blue Cross had not heard from the attorney it nevertheless granted his appeal request on July 20.
 
 
 8
 The attorney still did not respond. Blue Cross on August 6 informed him that it had to receive the information requested in its June 8 letter by August 24 or the appeal could be dismissed for abandonment. The attorney also missed this deadline. On September 1 Blue Cross notified him that the appeal would be dismissed unless it received the requested material within ten days or he demonstrated good cause for failing to produce it. This time the attorney responded with a general denial of all reimbursement adjustments, stating "[i]t is the position of my clients that we do not understand either the credits that were allowed in the audit nor the disallowances which came about in the audit."
 
 
 9
 An interlude of several months followed during which an accountant hired by the attorney of the providers examined the workpapers arising from the Blue Cross audit. This examination did not lead to a position paper. Blue Cross contacted the attorney on December 22 to give him a thirty-day deadline. When he did not respond Blue Cross on January 21, 1977, gave him ten days to submit a position paper. This request was renewed on February 16 and on March 9 Blue Cross gave the attorney a final deadline. This time he did respond, nine months after the June 8 letter. His response called the letters of Blue Cross an example of the "continuing and outrageous irresponsibility that is the other part of the record" and warned Blue Cross "to avoid essentially irrelevant argument." He did, however, agree to reconsider his position if Blue Cross made other records available. On March 26 he wrote again, asking to see more of Blue Cross' records and submitting a lengthy statement that listed the privileges he expected at trial, stated his opposition to "every position asserted by Blue Cross in its respective audits," and included a fifty-three page summary of disagreements with the Blue Cross audit.
 
 
 10
 This fifty-three page "position paper" did not contain the documentation or citations to governing law or regulations that Blue Cross had been requesting since June 8, 1976. Blue Cross nevertheless accepted the paper. It contacted Blue Cross of Southern California (the Plan)[3], which handled the providers' accounts, and asked it to prepare a response. The Plan, pointing out that the paper challenged over 400 items without citing the specific basis for dispute on any, claimed it could not proceed without a more detailed statement. Blue Cross asked the attorney to submit an expanded position paper. His answer was that the Plan, having rejected his initial figures, should bear the expense of preparing the position paper. He added that he found the Plan's past work neither "competent or clear," and asked for damages and attorney's fees for the "substantial" damage Blue Cross had imposed on his clients.
 
 
 11
 By now it was July 17, 1977, some thirteen months after skirmishing commenced. In an attempt to speed up the appeal, Blue Cross arranged a prehearing conference. On November 29 Blue Cross, the providers' attorney, and the Plan met and agreed that the Plan would prepare a more detailed description of its adjustments for one of the three homes. The attorney would then respond and if the process led to resolution, the two other accounts would be handled similarly. On February 24, 1978, the Plan sent the attorney a computer printout showing all payments, with monthly billing details, for Euclid Convalescent Center. It also sent a paper reconciling these figures with the "remittance advices" on which Euclid had summarized its billing information.
 
 
 12
 This attempt to speed up the appeal did not work. The attorney complained that he could not work with any material not directly based on Euclid's cost reports and that the Blue Cross material, having "no relationship to the Provider's cost reports," was "simply and unqualifiedly 'garbage.' " The Plan, at Blue Cross' request, responded by explaining the relationship between its figures and the provider's cost reports. After additional prodding from Blue Cross, the attorney agreed that he would try to reconcile the figures.
 
 
 13
 He remained inactive, however. Blue Cross wrote on November 15 and again on December 22, 1978, asking for his reconciliation. Its December letter, which stated that in the absence of a response by January 8, 1979, the appeal would be treated as abandoned, finally elicited a reply. At this point, approximately nineteen months from the date the dispute arose, the attorney wrote that it had been impossible to reconcile the Plan's figures with his own and that he wanted to proceed to a hearing. Blue Cross agreed to so proceed, but on two conditions. The first was that the attorney focus on six major items of dispute; the second that he provide a statement of the law and regulations supporting his disagreement with the Blue Cross audits. He was given sixty days to produce this material. The attorney quickly rejected any limitation of issues and repeated his view that the burden was on the Plan to refute his figures. Blue Cross insisted that the attorney prepare a position paper; in return the attorney accused the hearing officer of bias. He did produce, however, a lengthy analysis of his figures for one home during one cost year to illustrate the position he intended to develop during the hearing. He again refused to consider the Plan's workpapers. The figures he provided were undocumented, with a number of adjustments containing no explanation.
 
 
 14
 Blue Cross, finding these papers inadequate, dismissed the appeal with prejudice on May 14, 1979. It noted that in three years of discussion the providers' attorney had never produced a document referring to the law, regulations, or facts supporting his position. Almost a year passed without activity by either side. The government then sued in district court on May 13, 1980, to enforce the overpayment determination by Blue Cross. Both sides moved for summary judgment, but later stipulated that the district court should initially decide whether the providers had exhausted their administrative remedies and whether the statute of limitations had run on the government's suit. The district court held that the statute had not run on the lawsuit and that the providers had forfeited their right to challenge the overpayments by failing to exhaust their administrative remedies. Accordingly it entered judgment for the government.
 
 
 15
 The providers appeal and assert that the statute of limitations barred the government's case, that the district court erred in holding that the providers had failed to exhaust their remedies, and that the district court abused its discretion in enforcing the stipulation made during the consideration of the cross-motions for summary judgment. Finally, they also argue that the district court considered inadmissible evidence and was influenced by ex parte contacts. We shall consider at the outset an issue of jurisdiction not addressed by the parties. Thereafter we will consider the limitations question and the issue arising from the stipulation. The remaining issues will then receive their turn.
 
 II.
 JURISDICTION
 
 16
 We hold that 28 U.S.C. Sec. 1345[4] provides jurisdiction to decide the issues raised by the providers in this case. Although the question was not raised in the proceedings below, we have a duty to ensure that such jurisdiction exists before advancing to the merits. Fed.R.Civ.P. 12(h)(3); Washington Local v. International Brotherhood of Boilermakers, 621 F.2d 1032, 1033 (9th Cir.1980). A potential bar to jurisdiction to consider these issues is posed by section 205(h) of the Social Security Act, 42 U.S.C. Sec. 405(h), incorporated into the Medicare Act by 42 U.S.C. Sec. 1395ii. Section 405(h) provides that:
 
 
 17
 The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.
 
 
 18
 In Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), the Supreme Court held that section 405(h) rendered the statutory appeal procedures for the Social Security Act, 42 U.S.C. Sec. 405(g), the exclusive route for a constitutional challenge to the Act's provisions. The Court rejected general federal question jurisdiction over such claims, stating that the third sentence of section 405(h) should be read literally. So read, it requires that "no action" be brought under section 1331 on claims arising under the Act. No jurisdiction under that section exists for such claims. Section 405(h) thus did more than codify the requirement that administrative remedies first be exhausted. 422 U.S. at 756-60, 95 S.Ct. at 2462-2464. The Court rejected the view that the constitutional claims did not "arise under" the Act, which, it observed, provided "both the standing and the substantive basis for the presentation of the constitutional contentions." Id. at 761, 95 S.Ct. at 2464. It noted that because section 405(g) provided for suit in the district court after a final decision by the Secretary, it did not face the troubling question whether Congress could bar all judicial review of the appellees' constitutional claims. Id. at 761-64, 95 S.Ct. at 2464-2466. We have since held that the incorporation of section 405(h) into the Medicare Act makes the provider appeal procedures in 42 U.S.C. Sec. 1395oo, which governs appeals for cost-reporting years ending on or after June 30, 1973, a "prerequisite to the Court's very jurisdiction." Pacific Coast Medical Enterprises v. Harris, 633 F.2d 123, 138 (9th Cir.1980); see Daniel Freeman Memorial Hospital v. Schweiker, 656 F.2d 473, 475-76 (9th Cir.1981).
 
 
 19
 Our problem in this case is different, however. It involves an effort by the government to recover excess payments made to providers with respect to pre-1973 cost-reporting years, for which there is no statutorily mandated procedure for provider appeal.[5] The Second Circuit has recently faced a very similar issue. In United States v. Aquavella, 615 F.2d 12 (2d Cir.1979), that court held that section 405(h) was inapplicable because under the facts of that case there was no provision for an administrative finding or decision by the Secretary. Id. at 19. Moreover, any bar to the use of section 1331 jurisdiction was inoperative inasmuch as the suit was brought by the government, not against it, under section 1345. Id. The court concluded that to apply section 405(h) to bar judicial review of any defenses urged by providers would result in depriving providers of all judicial review. Id. at 20-21. The court did not believe that Congress intended to compel such a result.
 
 
 20
 We agree with the Second Circuit. The district court had jurisdiction under section 1345 to decide the issues presented in this case. This result is consistent with our past disposition of pre-1973 reimbursement cases brought by providers. We have transferred these cases to the Court of Claims under 28 U.S.C. Sec. 1491.[6] See Memorial, Inc. v. Harris, 55 F.2d 905, 914 (9th Cir.1980); Pacific Coast Medical Enterprises, 633 F.2d at 125 n. 2; Drennan v. Harris, 606 F.2d 846, 849-50 (9th Cir.1979). The Court of Claims in turn has assumed jurisdiction "at least so far as to ensure compliance with statutory and constitutional provisions." Whitecliff, Inc. v. United States, 536 F.2d 347, 351 (Ct.Cl.1976), cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); Spokane Valley General Hospital, Inc. v. United States, 688 F.2d 771, 775-76 (Ct.Cl.1982). To deny such jurisdiction would create substantial due process problems and be contrary to the "normal presumption in favor of judicial review." Whitecliff, 536 F.2d at 350 & n. 7. This reasoning parallels that of the Second Circuit in Aquavella and supports our conclusion.[7]
 
 III.
 LIMITATIONS
 
 21
 We next hold that 28 U.S.C. Sec. 2415 does not bar the government's case. Section 2415 provides alternative limitations periods of six years from the final audit or "one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later." Inasmuch as the final audits of the providers were completed in 1972 and 1973, the government's suit in 1980 was not within the six-year period. On the other hand, its claim was filed on May 13, 1980, one day less than a year from the dismissal of the providers' appeal on May 14, 1979. The dismissal was a final decision in the "applicable administrative proceeding." Blue Cross required internal appeal before it would grant adjustments. A final decision in this internal appeal procedure commenced the running of the one-year period. Thus, the statute had not run on the government's claim.[8]
 
 IV.
 THE STIPULATION
 
 22
 The providers have shown no possibility of confusion in the stipulation of the issues of exhaustion and limitations to be decided initially by the district court. The record shows them eager to consent to the stipulation. They complain now only after they have lost their gamble. The providers have not offered any reason for us to believe that the outcome would be any different if we found that the exhaustion question should have been deferred. They allege that they would have introduced affidavits proving that other providers had received hearings even though submitting less complete position papers than their own, and, arguably, thus failing to exhaust administrative remedies to a greater extent than did they. We are shown no providers, however, that received a hearing after a record of procrastination like that before us. Moreover, nothing the providers might present regarding the merits of their claims would entitle them to overcome their failure to exhaust the administrative process. The district court, therefore, properly enforced the stipulation.
 
 V.
 
 23
 THE PROVIDERS' FAILURE TO EXHAUST THEIR REMEDIES
 
 
 24
 The district court, after finding that the providers' motive throughout their dealings with Blue Cross had been to cause frustration and delay, dismissed their objections to the overpayment determination, without reaching the merits, because the providers failed to raise their complaints before Blue Cross. We hold that the district court did not abuse its discretion.
 
 
 25
 The requirement of exhaustion can spring from an Act of Congress that designates an exclusive administrative avenue of appeal. When that is the case the administrative proceedings are, as already pointed out, a precondition to federal court jurisdiction. The courts lack power to undertake judicial review until the proceedings have been completed. Weinberger v. Salfi, 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975); Montgomery v. Rumsfeld, 572 F.2d 250, 252-54 (9th Cir.1978). As also noted above, however, the current Medicare appeal procedures set forth in section 1395oo do not apply to pre-1973 cost-reporting years. It follows that these exclusive procedures do not bar our jurisdiction. Nonetheless, the judicially created doctrine of exhaustion may stay judicial intervention. The courts under that doctrine may still require exhaustion if: (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review. McGee v. United States, 402 U.S. 479, 484, 91 S.Ct. 1565, 1569, 29 L.Ed.2d 47 (1971); McKart v. United States, 395 U.S. 185, 193-95, 89 S.Ct. 1657, 1662-1663, 23 L.Ed.2d 194 (1969); Stauffer Chemical Co. v. FDA, 670 F.2d 106, 107 (9th Cir.1982); Montgomery, 572 F.2d at 253. The judicially created doctrine of exhaustion of remedies does not limit jurisdiction, Stauffer, 670 F.2d at 107; SEC v. G.C. George Securities, Inc., 637 F.2d 685, 687 (9th Cir.1981); it merely provides that the district courts have discretion to determine its applicability, id. Their discretion, however, is not unbounded; they must balance the three factors derived from McKart and McGee.
 
 
 26
 The district court here properly applied these factors to terminate the providers' case. This dispute ought to have received administrative resolution. Agency expertise is greatly needed to resolve health care disputes.[9] Exhaustion is also required to prevent the providers from bypassing the administrative process. The record leaves no room to doubt that the providers have for three years abused Blue Cross' appeal procedures solely to avoid or delay any proper repayment of their Medicare advances. Although they bore the burden of documenting their expenses, 20 C.F.R. Secs. 405.406, -. 453 (1975), they never made a good faith effort to produce the information required to support their claims. To afford them now one more chance would encourage other providers to indulge in similar behavior. Our administrative and judicial structure has no need for such incentives. And, finally, there can be no doubt that administrative hearings offered an opportunity to resolve this dispute without resort to the courts. Blue Cross was willing to consider any challenges to its audit for which the providers could provide factual or statutory support. There is no indication that it would have rejected legitimate claims. All of these considerations support the requirement of exhaustion in this case.
 
 
 27
 The providers argue that exhaustion is inapplicable because additional administrative proceedings would have been futile and were, in any event, optional. See Aleknagik Natives Ltd. v. Andrus, 648 F.2d 496, 499-501 (9th Cir.1980); e.g., Humboldt County v. United States, 684 F.2d 1276, 1285 (9th Cir.1982); United Farm Workers v. Arizona Agricultural Employment Relations Board, 669 F.2d 1249, 1253-54 (9th Cir.1982). We disagree. The providers point to several internal discussions held by officials of Blue Cross, the Bureau of Health Insurance, and the Department of Justice to decide whether to consider the appeal abandoned. These discussions, however, either preceded the providers' request for a hearing or occurred after their attorney had missed one of the many deadlines. They do not indicate that exhaustion would have been futile. Each time the attorney sought to renew his dealings with Blue Cross, it demonstrated a willingness to consider his arguments in spite of his failure to comply with deadlines or to present an adequate position paper.
 
 
 28
 Nor are we persuaded by the alleged failure of the hearing officer to adhere to Blue Cross' internal procedures. There is no support for these charges. Such departures from Blue Cross procedures as there were favored the providers. The hearing officer acted correctly in finally dismissing the case for abandonment, as authorized by the Medicare Provider Appeals Procedures of which the providers' attorney was made aware on June 8, 1976. Blue Cross did not manipulate its procedures to secure a dismissal. The attorney of the providers rendered the administrative proceedings futile, not Blue Cross. The providers cannot complain in this forum of whatever injury their attorney may have inflicted upon them.
 
 
 29
 Also it accomplishes nothing to describe the Blue Cross procedures as "optional." All providers who wished to resist an overpayment adjustment were required to appeal. Blue Cross' audits were not final until the providers exhausted their internal appeals. Blue Cross provided this avenue of relief to all pre-1973 providers who wished to avail themselves of it.[10] The judicially created doctrine of exhaustion of administrative remedies does not depend for its existence on the approval of the Secretary or Congress.
 
 
 30
 The exhaustion requirement may appear harsh to the providers; but they have brought this result on themselves. When a litigant employs the administrative process but through procrastination, delay, and a failure to provide documentation prevents the agency from exercising its expertise, the litigant has chosen to forego asserting its complaints and forfeits its opportunity to raise them. Sears, Roebuck & Co. v. FTC, 676 F.2d 385, 398 (9th Cir.1982); Litton Industries v. FTC, 676 F.2d 364, 369-70 (9th Cir.1982).[11] Enforcement of the district court's judgment is entirely proper in this case. It is time to bring this matter to a close.
 
 VI.
 OTHER ISSUES
 
 31
 There is no merit to the providers' other arguments. The district court did not consider "irrelevant" material; the government's accounting summary illustrated the providers' motive to delay, as did the pre-1973 evidence of delay. Nor have the providers stated a claim under 28 U.S.C. Sec. 455 or Canon 3 C(1)(a) of the Code of Judicial Conduct.
 
 
 32
 For the reasons stated, the judgment of the district court is affirmed.
 
 
 33
 AFFIRMED.
 
 
 
 *
 Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 Regulations governing Medicare reimbursement are currently found in 42 C.F.R.; the 1975 regulations in 20 C.F.R. govern disposition of this appeal
 
 
 [2]
 The attorney was Harry Margolis
 
 
 [3]
 This regional office, identified as "the Plan" after its designation in Blue Cross' internal correspondence, bore responsibility for the audit of the providers' accounts. It was also responsible for presenting the evidence of overpayment in a hearing before the national Blue Cross
 
 
 [4]
 Section 1345 provides: "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized by Act of Congress."
 
 
 [5]
 Because there was no formal provision for review by the Secretary, we are not faced with the question whether claims for which there is provision for a finding and decision by the Secretary can be directly challenged on procedural or constitutional grounds in district court. This circuit has found that even in the face of such procedures a direct challenge to the "procedural regularity" of a reimbursement rule may be brought under Sec. 1331. Ringer v. Schweiker, 684 F.2d 643, 645-46 (9th Cir.1982); see Daniel Freeman Memorial Hospital, 656 F.2d at 476 (dictum that no statutory bar exists for challenge to procedural regularity based on Administrative Procedure Act (APA), 5 U.S.C. Secs. 551-559, 701-706, although holding part of claim moot and other part not properly before district court where facts supporting claim required administrative determination); see also National Ass'n of Home Health Agencies v. Schweiker, 690 F.2d 932, 936-37, 939-41 (D.C.Cir.1982) (jurisdiction under Sec. 1331 to consider claims of procedural irregularity under APA as well as statutory challenge to Secretary's authority), cert. denied, --- U.S. ----, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983); Humana of South Carolina, Inc. v. Califano, 590 F.2d 1070, 1080-81 (D.C.Cir.1978) (no jurisdiction under Sec. 1331 for statutory and constitutional claims designed to "intercept" Secretary's action on reimbursement, but jurisdiction under APA in other challenges); St. Louis Univ. v. Blue Cross Hosp. Service, 537 F.2d 283, 291-93 (8th Cir.1976) (jurisdiction to hear constitutional challenge to reimbursement claim procedures), cert. denied, 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1977). Other circuits have held open the possibility that the exhaustion requirement might be waived for "collateral" constitutional claims, but then found such claims not properly presented. Americana Healthcare Corp. v. Schweiker, 688 F.2d 1072, 1082-83 (7th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983); Northlake Community Hosp. v. United States, 654 F.2d 1234, 1241 (7th Cir.1981); Kechijian v. Califano, 621 F.2d 1, 5 (1st Cir.1980); Herzog v. Secretary of HEW, 686 F.2d 1154, 1161 (6th Cir.1982). But see Hadley Memorial Hosp., Inc. v. Schweiker, 689 F.2d 905, 910-11 (10th Cir.1982) (Sec. 405(h) bars procedural challenge under Sec. 1331 to Secretary's Malpractice Rule); Hopewell Nursing Home, Inc. v. Schweiker, 666 F.2d 34, 38-40 (4th Cir.1981) (constitutional challenges must be raised in section 1395oo procedures); Dr. John T. MacDonald Found., Inc. v. Califano, 571 F.2d 328, 331 (5th Cir.) (en banc) (statutory preclusion of all claims, including constitutional, where Sec. 405(h) was applicable), cert. denied, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978)
 
 
 [6]
 Section 1491 provides in part that "[t]he Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States ...." Section 1491 can be viewed as the providers' analogue to section 1345. Compare supra note 4
 
 
 [7]
 For other circuits that, faced with similar pre-1973 claims by providers, reserved the question of section 405(h)'s effect on judicial review of such claims by acknowledging jurisdiction in the Court of Claims, see Dr. John T. MacDonald Found., Inc. v. Califano, 571 F.2d 328, 331-32 (5th Cir.) (en banc), cert. denied, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978); Trinity Memorial Hosp., Inc. v. Associated Hosp. Serv., Inc., 570 F.2d 660, 667-68 (7th Cir.1977); South Windsor Convalescent Home, Inc. v. Mathews, 541 F.2d 910, 913-14 (2d Cir.1976); cf. United States v. Sanet, 666 F.2d 1370, 1374-75 (11th Cir.1982) (declining to hear constitutional claims under Sec. 1345 because physician could pay claim and then raise issues in action in Court of Claims). The Sixth Circuit rejected this approach because it could not "in good conscience" transfer a provider lawsuit to the Court of Claims without deciding the jurisdictional question; "If Sec. 405(h) does apply to the present controversy, it is binding on all courts." Chelsea Community Hosp. v. Michigan Blue Cross, 630 F.2d 1131, 1135 (6th Cir.1980) (emphasis in original). The court went on to find section 405(h) inapplicable to pre-1973 Medicare reimbursement actions, and that the case could properly be transferred to the Court of Claims. Id. at 1135-36. The Fourth Circuit has also rejected automatic transfer to the Court of Claims, but delayed decision on jurisdiction for pre-1973 claims until the Secretary had an opportunity to pass on these claims while hearing the providers' post-1973 claim. Hopewell Nursing Home, Inc. v. Schweiker, 666 F.2d 34, 41-42 (4th Cir.1981)
 
 
 [8]
 Unlike the district court, we place no reliance upon Guerra v. Manchester Terminal Corp., 498 F.2d 641 (5th Cir.1979). Guerra applied an equitable rule designed to meet the special purposes of Title VII to toll the statute of limitations under 42 U.S.C. Sec. 1981 when a charge was filed with the EEOC. In Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the Supreme Court, looking to the different purposes of Sec. 1981 and Title VII, held that an EEOC action did not prevent the running of the limitations period for a Sec. 1981 action. See Williams v. Phil Rich Fan Mfg. Co., 552 F.2d 596, 597 (5th Cir.1977)
 
 
 [9]
 Congress acknowledged the importance of agency expertise in this area in 1972 when it created the exclusive administrative avenue of appeal to the Provider Reimbursement Review Board in 42 U.S.C. Sec. 1395oo. See generally Homer & Platten, Medicare Provider Reimbursement Disputes: An Analysis of the Administrative Hearing Procedures, 63 Geo.L.J. 107, 117-20 (1974)
 
 
 [10]
 The three-year limit in 20 C.F.R. Sec. 405.1813 for discretionary appeals applied only to post-1971 cost-reporting years. Blue Cross' policy was to provide appeals beyond the three-year limit for pre-1971 years
 
 
 [11]
 The providers are wrong to analogize to the threatened deprivation of due process in United States v. Aquavella, 615 F.2d 12 (2d Cir.1979). Aquavella does not speak to the need for review when the intermediary does provide a hearing and the district court takes jurisdiction to hear all claims properly raised in the administrative process. There is no basis for the providers' contention that "[u]nless this Court intervenes now, the grave constitutional concerns identified by the Aquavella and Chelsea courts will have materialized and the 'rubber stamping' of the audit report of nameless, faceless, presently unavailable, self-interested auditors, untested by confrontation and cross-examination, will have been permitted to suffice for due process." As Blue Cross can attest, the providers in this case have not suffered any lack of due process