**INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA, et al., Appellants,**

v.

**Bruce BABBITT, et al., Appellees.**

**Nos. 95–5210, 95–5245.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 16, 1996.

Decided Aug. 27, 1996.

**1250**

L. Poe Leggette, argued the causes for appellants, with whom, E. Edward Bruce, Washington, DC, was on the briefs.

William B. Lazarus, United States Department of Justice, argued the cause for appellees, with whom Peter D. Coppelman, Acting Assistant Attorney General, and Robert L. Klarquist, Washington, DC, were on the brief.

Lawrence G. McBride, Washington, DC, was on the brief for amicus curiae Interstate Natural Gas Association of America et al., in support of appellants.

Frederick C. Whitrock, Baton Rouge, LA, was on the brief for amicus curiae State of Louisiana in support of the appellees.

Jan Unna, Special Assistant Attorney General, was on the brief for amicus curiae State of New Mexico.

Jill E. Grant, Washington, DC, entered an appearance for amicus curiae Jicarilla Apache Tribe.

Before: BUCKLEY, SENTELLE and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

Separate dissenting opinion filed by Circuit Judge ROGERS.

SENTELLE, Circuit Judge:

Appellants, an oil and gas producer and a petroleum industry trade association, challenge as arbitrary and capricious and inconsistent with applicable law a Department of the Interior ("DOI") decision to collect royalties and interest charges from the gas producer appellant on a settlement payment made to a lessee of a natural gas well on allotted Indian lands in exchange for a compromise of accrued and prospective take-or-pay liabilities under an outstanding contract. The gas producer appellant also claims that, even if the DOI decision to collect royalties was valid, the government is barred by a statute of limitations from collecting royalties and interest on the specific take-or-pay settlement payment at issue in this case. The District Court granted summary judgment for the government on both issues. Because we conclude that DOI impermissibly departed from its established practices in attempting to collect royalties on the settlement

payment, we reverse the District Court and hold that the gas producer appellant cannot be required to pay any royalties on the settlement payment. We accordingly find it unnecessary to consider the statute of limitations issue.

## I. Background: The Natural Gas Industry and Royalties on "Take-or-Pay" Payments and Settlements

DOI, through its Minerals Management Service ("MMS"), issues and administers leases for offshore oil and gas production under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, for onshore production on federal lands under the Mineral Leasing Act ("MLA"), 30 U.S.C. § 181 *et seq.*, and the Mineral Leasing Act for Acquired Lands, 30 U.S.C. § 351 *et seq.*, and for production on Indian tribal and allotted lands under 25 U.S.C. §§ 396, 396a–396g. Certain DOI leases include royalty provisions which calculate royalties as a percentage of the "amount or value of the production saved, removed, or sold" by the lessee. *See, e.g.,* OCSLA, 43 U.S.C. § 1337(a)(1)(A), (C) & (G); MLA, 30 U.S.C. § 226(b) & k(1)(2); *see also* 25 C.F.R. § 211.13 (1995) (tribal leases); 25 C.F.R. § 212.16 (1995) (Indian allotted land leases). This case involves a dispute over whether lump-sum payments made by gas pipelines to lessees to settle large "take-or-pay" liabilities accrued under long-term gas purchase contracts are properly subject to royalties.

This controversy arises from a fundamental change in the natural gas industry over the past several years. *See generally United Distribution Cos. v. FERC,* 88 F.3d 1105 (D.C.Cir.1996) (per curiam) (discussing the line of cases beginning with *Associated Gas Distributors v. FERC,* 824 F.2d 981 (D.C.Cir. 1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988) ("*AGD I*"), and including *American Gas Ass'n v. FERC,* 888 F.2d 136 (D.C.Cir.1989), *cert. denied sub nom. FERC v. Public Util. Comm'n,* 498 U.S. 952, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990) ("*AGA I*"), and *American Gas Ass'n v. FERC,* 912 F.2d 1496 (D.C.Cir.1990), *cert. denied sub nom. City of Willcox v. FERC,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1044 (1991) ("*AGA II*")). Previously, natural gas pipelines acted as gas merchants, purchasing gas at the wellhead, transporting it, and reselling it to local distribution companies ("LDCs") and large end users. In the 1980s, after concluding that this system resulted in various market distortions and inefficiencies, the Federal Energy Regulatory Commission ("FERC") began the lengthy process of transforming pipelines from gas merchants to common carriers of gas. Along the way, Congress completed the deregulation of wellhead gas prices through the Natural Gas Wellhead Decontrol Act of 1989 ("Decontrol Act"), Pub.L. No. 101–60, 103 Stat. 157. Under regulated wellhead pricing, the pipelines, consistent with FERC policy, had entered into long-term, fixed price wellhead purchase contracts. After wellhead price deregulation the market price for gas dipped well below the long-term contract prices pipelines were committed to pay. *AGD I,* 824 F.2d at 995–96.

Unfortunately for the pipelines, the wellhead contracts usually contained take-or-pay provisions, which required the pipeline to pay for as much as seventy-five percent of the contracted-for gas even if it did not take the gas. *Id.* at 996. (Often, the pipeline could credit these payments toward "make-up gas," gas taken at a later date. *See Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159, 1164 (5th Cir.1988) ("*Diamond Shamrock*")). Because the pipelines could not rely on corresponding long-term sales contracts with their customers (FERC had allowed those customers to abrogate such contracts with pipelines, *see Wisconsin Gas Co. v. FERC,* 770 F.2d 1144, 1152 (D.C.Cir. 1985), *cert. denied,* 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986)), they soon found themselves headed for financial ruin as their customers switched to cheaper supply sources. FERC experimented with several relief mechanisms, *see United Distribution Cos.,* 88 F.3d at 1124–27; *Baltimore Gas & Elec. Co. v. FERC,* 26 F.3d 1129, 1132–33 (D.C.Cir.1994); but the major resolution of the take-or-pay liabilities occurred through settlements between pipelines and their suppliers. *See AGA II,* 912 F.2d at 1508–09 (upholding FERC's decision to allow private negotiations, under incentives structured by

the Commission, to remedy the industry's take-or-pay problems). The pipelines could then pass on at least some of the costs of these settlements to their customers. *See* Order No. 528, Mechanism for Passthrough of Pipeline Take–or–Pay Buyout and Buydown Costs, 53 FERC ¶ 61,163 (1990), *order on reh'g*, 54 FERC ¶ 61,095, *reh'g denied*, 55 FERC ¶ 61,372 (1991).

The take-or-pay settlements were of two types—"buydowns" and "buyouts." In a buydown, the pipeline pays a cash lump sum to the producer in exchange for contract amendments (or a new contract) providing for continued sale of the contracted-for gas at reduced prices. In a buyout, the pipeline pays a cash lump sum in exchange for release of the pipeline from the gas purchase contract. The producer is then free to sell the gas to someone else. Some contract settlements included both partial buydowns and partial buyouts. In some cases, the settlement payments (or portions thereof) could be recouped through future gas purchases in which the payments would be credited toward the purchase price of gas. *See, e.g., Blackwood & Nichols Co., Ltd.*, MMS–88–0008–O&G (Apr. 20, 1989), 10 Gower Fed. Serv., *Royalty Valuation and Management* at 2 ("*Blackwood & Nichols Co.*") (construing a settlement agreement containing both a recoupable and a nonrecoupable payment). Both types of contracts also often include a settlement of existing liability for previously incurred take-or-pay obligation.

As DOI lessees were among the producers entering settlement agreements, MMS began to address the royalty implications of take-or-pay payments and contract settlement payments on lessees' liabilities. As we noted earlier, the statutes governing the leases require that they contain a royalty clause contemplating royalties to be paid on a set percentage of the "amount or value of the production saved, removed, or sold" by

the lessee. *See, e.g.,* OCSLA, 43 U.S.C. § 1337(a)(1)(A); MLA, 30 U.S.C. § 226(b); *see also* 25 C.F.R. § 211.13 (1995) (tribal leases); 25 C.F.R. § 212.16 (1995) (Indian allotted land leases). MMS' general rule on royalties, known as the "gross proceeds rule," provides that "under no circumstances shall the value of production for royalty purposes be less than the *gross proceeds* accruing to the lessee for lease production." 30 C.F.R. § 206.152(h) (1995) (emphasis added).[1] 30 C.F.R. § 206.151 (1995) defines "gross proceeds" as "the total monies and other consideration accruing to an oil and gas lessee for the disposition of [gas]." The underlying issue leading to the present case is whether gas contract settlement payments are included in "gross proceeds." In a series of administrative decisions, MMS determined that royalties are due on both take-or-pay payments and payments for gas contract settlements. Before these decisions reached the stage of judicial review, DOI issued rules in January 1988 adopting a broad definition of "gross proceeds":

> "Gross proceeds" (for royalty payment purposes) means the total monies and other consideration accruing to an oil and gas lessee for the disposition of ... gas.... Gross proceeds, as applied to gas, also includes but is not limited to: Take-or-pay payments.... Payments or credits for advanced exploration or development costs or prepaid reserve payments that are subject to recoupment through credits against the purchase price or through reduced prices in later sales and which are made before production commences become part of gross proceeds as of the time of first production.

Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed.Reg. 1230, 1275 (January 15, 1988) (promulgating 30 C.F.R. § 206.151 (1988)).

---

1. The version of the gross proceeds rule in effect on December 1, 1987, the date of the making of the take-or-pay settlement at the source of this litigation, did not differ in any substantive manner. That version provided that "[u]nder no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the

gross proceeds accruing to the lessee from the sale thereof." 30 C.F.R. § 206.103 (1987). The current wording of the gross proceeds rule was adopted in 1988. *See* Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed.Reg. 1230, 1275 (January 15, 1988) (promulgating 30 C.F.R. § 206.151 (1988)).

In August 1988, some lessees successfully challenged the pre–1988 rulings requiring royalties to be paid immediately on take-or-pay payments. Because the lease and the controlling statutes contemplated royalty payments on the value of the *"production"* of gas, the Fifth Circuit concluded that royalties were not due on take-or-pay payments at the time those payments are made. *Diamond Shamrock*, 853 F.2d at 1168 (emphasis added). The court reasoned that the statute contemplates royalties on gas actually produced and taken, but take-or-pay payments are "payment for the pipeline-purchaser's *failure* to purchase (take) gas," not payment for gas. *Id.* at 1167. Accordingly, "[r]oyalty payments are due only on the value of minerals actually produced, i.e., physically severed from the ground. No royalty is due on take-or-pay payments unless and until gas [that is, make-up gas] is actually produced and taken." *Id.* at 1168.

Rather than seeking review of the *Diamond Shamrock* decision or applying it only to leases within the geographic domain of the Fifth Circuit, MMS amended its gross proceeds rule to comport with the decision. It deleted the phrase "[t]ake-or-pay payments" from the definition of "gross proceeds" and determined that royalties would only accrue on take-or-pay payments when a pipeline takes make-up gas. Revision of Gross Proceeds Definition in Oil and Gas Valuation Regulations, 53 Fed.Reg. 45,082, 45,084, 45,-083 (Nov. 8, 1988). MMS also applied the rule of *Diamond Shamrock* in contemporaneous and subsequent administrative proceedings. *See Santa Fe Energy Co.*, MMS–85–0046–OCS (Oct. 14, 1988), 5 Gower Fed. Serv., *Royalty Valuation and Management* at 4 (citing *Diamond Shamrock* and holding that royalties on take-or-pay payments and settlements "only become due if and when make-up gas is taken by the pipeline"); *Blackwood & Nichols Co.* at 2 (holding that, for a settlement agreement containing both a recoupable and a nonrecoupable payment, only the recoupable payment would become royalty bearing, and only "to the extent credited against future production"); *Wolverine Exploration Co.*, MMS–88–0052–IND (May 2, 1990), 10 Gower Fed. Serv., *Royalty Valuation and Management* at 4 (denying royal-ties on a settlement payment because the payment was not "subject to recoupment through credits against the purchase price or through reduced prices in later sales").

On May 3, 1993, MMS took another step in clarifying its treatment of settlement payments. In a letter from James W. Shaw, Associate Director for Royalty Management, MMS announced that "some or all of a settlement payment is or will become royalty bearing if production to which specific money is attributable occurs." Letter from James W. Shaw, Associate Director for Royalty Management, MMS, addressed to "Payor" (May 3, 1993) ("May 1993 letter"). An enclosed description of the MMS royalty policy on settlement payments is more explicit:

> Consistent with [*Diamond Shamrock*], the [Royalty Management Program ("RMP")] interpretation and policy is that a payment or a portion of a payment is royalty bearing if the mineral to which the payment is attributable is produced and sold either to the original purchaser or a substitute purchaser, as part of the "gross proceeds" received for disposition of that production under applicable regulations.

May 1993 letter, Enclosure 1 at 1. Under this interpretation, royalties become due on settlement payments regardless of whether those payments are "recoupable" or not—the only relevant question is whether or not the gas which was originally spoken for in the settled contracts is eventually sold to *someone*.

## II. The Instant Dispute: Challenges by IPAA and Samedan

### A. Administrative Proceedings

In 1993, the Independent Petroleum Association of America ("IPAA") filed suit in the U.S. District Court for the Northern District of West Virginia challenging the May 1993 letter and an Assistant Secretary's June 1993 order requesting information on gas contract settlements. After transfer of the case to the D.C. District Court, IPAA dismissed its challenge to the June 1993 order. Soon thereafter, DOI issued its final decision on settlement payment royalties in a case in-

volving gas producer Samedan Oil Corporation ("Samedan"). Samedan's case was to become the test case for the settlement payment royalty question.

Samedan is a lessee of Indian lands under a 1979 lease which provides, in typical form, for a twenty percent royalty on the value of production which "shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof." In 1981, Samedan entered into a ten-year take-or-pay gas sales agreement with Southern Natural Gas Company ("Southern"). The take-or-pay clause required Southern to pay for eighty-five percent of the contracted-for gas in the event that it did not take the gas. A make-up clause allowed Southern to credit take-or-pay payments against "excess" or make-up gas (gas taken over and above the contract requirements) taken over the five years following the payments. By April 1985, the market price of gas had dropped to about one-fourth of the contract price, and Southern stopped taking gas from Samedan. In 1986, Southern refused to make $51,468 in take-or-pay payments billed by Samedan. On December 1, 1987, Samedan and Southern agreed to a complete buyout, terminating the 1981 contract in exchange for a "nonrecoverable and nonrefundable" $100,000 payment "in resolution and full and final settlement of any and all obligations and liabilities that Southern has or may have under the Contract." Settlement Agreement and Release at 2 (December 1, 1987). On the same day, Samedan contracted to sell the gas formerly allocated to Southern to Hadson Gas Systems ("Hadson") at the market price. Subsequently, Samedan also sold some of the gas to Transok. By 1989, Samedan had sold all the gas which would have been sold to Southern under the 1981 contract, but Southern purchased none of it.

Several years later and after an audit of Samedan's royalty obligations, MMS ordered Samedan to pay $20,000 in royalties, which represented twenty percent of the $100,000 settlement payment from Southern. MMS Service Order re Contract Settlement Between Samedan Oil Corporation and Southern Natural Gas Company Dated December 1, 1987 (December 2, 1993). MMS applied the policy outlined in its May 3, 1993 letter and concluded that $10,294 of the $100,000 payment represented compensation for already accrued take-or-pay liabilities and that the $89,706 represented a buyout payment for the remaining purchase obligations. *Id.* Samedan made an administrative appeal, but Assistant Secretary for Indian Affairs Ada E. Deer upheld the MMS order. *Samedan Oil Corp.*, MMS–94–0003–IND (September 16, 1994), 16 Gower Fed. Serv., *Royalty Valuation and Management.*

Assistant Secretary Deer first addressed the $89,706 buyout payment, considering situations where the pipeline continues to purchase gas after the settlement and situations where the gas is sold to a substitute purchaser:

> The parties to a buyout arrangement ... know that subsequent production will be sold at lower prices and that the lessee-producer will not obtain the same price as under the original contract. A lump-sum payment to buy out the obligation to take required volumes at higher prices therefore compensates the lessee in some degree for the reduced price the lessee will receive when the gas is produced and delivered.

> The fact that a substitute purchaser, instead of the original purchaser, is involved in the buyout situation does not change the result. The result from the lessee's perspective, and the benefit to the lessee from the production, is the same regardless of the identity of the party taking delivery. If bought out volumes are produced and delivered to the substitute purchaser under a successor agreement, the amount paid by the original purchaser to be relieved of its obligation to take the gas is part of the benefit which the lessee derives from that production. The payment therefore is attributable to those volumes and becomes part of the total amount paid to the lessee for that production.

*Id.* at 16–17. Assistant Secretary Deer found irrelevant the fact that 30 C.F.R. § 206.152(b)(1)(ii) (1993), one of the regulations governing MMS' oversight of royalty payments, refers to "the total consideration actually transferred either directly or indi-

rectly from the *buyer* to the seller for the gas" (emphasis added). "[T]here is no reason why the term 'the buyer' in the cited regulation cannot mean both buyers under both of the sales contracts to which the gas was subject under the circumstances involved here." *Samedan Oil Corp.*, MMS–94–0003–IND at 18.

The Assistant Secretary also rejected Samedan's argument that the May 1993 letter was inconsistent with numerous prior agency decisions and positions. *Id.* at 18–23. She also rejected the claim that under the Administrative Procedure Act ("APA") the letter could not be validly issued without notice-and-comment rulemaking, concluding that the letter "falls well within … the exception to the APA's notice-and-comment requirements for 'interpretive rules, general statements of policy, or rules of agency organization, procedure, and practice.'" *Id.* at 23–24 (quoting 5 U.S.C. § 553(b)(3)(A)). She further concluded that the $10,294 payment to settle accrued take-or-pay liabilities was also subject to royalties, reasoning that such a payment makes possible future production and delivery at lower prices. "The compromise payment therefore properly is regarded as a payment in anticipation of a lower price to be received by the lessee if and to the extent that the lessee later produces the volumes to which a take-or-pay payment would have been applied." *Id.* at 27. Samedan also claimed that the settlement agreement was comparable to a legal judgment, which is not a payment for production, and that the imposition of royalties was inconsistent with a previous MMS decision and with prior FERC statements about the nature of take-or-pay settlement payments. The Assistant Secretary rejected these arguments as well. *Id.* at 30–36.

**B. District Court Proceedings**

Samedan sought judicial review of Assistant Secretary Deer's ruling; the District Court consolidated Samedan's challenge with IPAA's challenge to the May 1993 letter; and DOI counterclaimed to enforce its policy. The court granted summary judgment for the government on all issues in two separate opinions. *Samedan Oil Corp. v. Deer*, 1995 WL 431307 (D.D.C. June 14, 1995); *Indepen-*

*dent Petroleum Ass'n of America v. Babbitt*, 1995 WL 431305 (D.D.C. June 14, 1995) ("*IPAA*").

In *IPAA*, the District Court considered three issues: (1) whether the May 1993 letter was a rulemaking subject to APA notice-and-comment requirements, (2) what the appropriate standard is for reviewing the Assistant Secretary's decision of September 16, 1994, and (3) whether that decision should survive the appropriate level of review. *IPAA*, 1995 WL 431305 at *3. The court held that the letter did not constitute a rule for APA notice-and-comment purposes. "Nothing in DOI's procedures vests authority in the Associate Director of MMS, or even the Director, to issue proclamations binding on the agency.… The court finds that the May 3 letter is not an 'agency statement,' it has no binding 'future effect,' and cannot 'prescribe law or policy.'" *Id.* at *4. The court also determined that even if the letter were a rule, it was exempt from notice-and-comment rulemaking because "it clearly was interpretative not substantive." *Id.* at *6; *see also* APA, 5 U.S.C. § 553(b)(A) ("[T]his subsection does not apply … to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.").

The District Court next concluded that, despite the plaintiffs' protestations, it would apply to Assistant Secretary Deer's decision the deferential *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), and *Enron Oil and Gas Co. v. Lujan*, 978 F.2d 212, 215 (5th Cir. 1992), *cert. denied*, 510 U.S. 813, 114 S.Ct. 59, 126 L.Ed.2d 29 (1993), standards for review of an administrative agency's interpretation of its governing statute and its own rules. *Id.* at *8. Under *Chevron*, a court first asks "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. If so, the court must give effect to Congress' intent. But if the court concludes that the statute is "silent or ambiguous with respect to the specific issue," it moves to the second step of the inquiry. *Id.* at 843, 104 S.Ct. at 2781–82. In

the second step, it defers to the agency's interpretation of the statute "if it is reasonable and consistent with the statute's purpose." *Nuclear Information Resource Serv. v. NRC*, 969 F.2d 1169, 1173 (D.C.Cir.1992) (internal quotation marks and citation omitted). A similar standard is applied in judicial review of an agency's interpretation of its own regulations. Such an interpretation "need only be reasonable, and not the only interpretation or the one the court would have reached if it were initially faced with the question." *Enron*, 978 F.2d at 215 (citation omitted). The District Court held that Deer's "construction of 'gross proceeds' is permissible, reasonable and not inconsistent with DOI regulations, nor with the governing statutes." *IPAA*, 1995 WL 431305 at *12. The court concluded that Deer's decision was not inconsistent with the Fifth Circuit's holding in *Diamond Shamrock*: "The May 3 letter covers new ground—lump-sum settlements—not touched upon by *Diamond Shamrock*. Only one issue was common to both situations; and treatment of that issue was totally consistent. Royalties on take-or-pay revenues are due only if make-up provisions are exercised." *Id.* at *10. The court also noted that, without royalties on settlement payments, "producers would have an incentive to negotiate with pipelines for large non-recoupable payments in exchange for drastically reduced future gas prices. DOI, acting on behalf of federal and Indian lessors, should not condone unjust enrichment of producers through self-serving, opportunistic settlement arrangements." *Id.* at *12. IPAA and Samedan appeal the District Court's decision.

In its separate *Samedan* opinion, the District Court considered Samedan's argument that the government's claim for royalties against Samedan is barred by the statute of limitations in 28 U.S.C. § 2415(a), which provides that all actions brought by the United States for money damages based on contract claims must be brought within six years after the claim arose or, if later, within one year of

final agency action. After considering several ambiguities in the terms of the statute as applied in this case, the court concluded that (1) the Samedan lease is a contract, but (2) neither the MMS order nor the government's counterclaim "pursued money damages as that term is utilized" in the statute of limitations. *Samedan*, 1995 WL 431307, at *5–*6, *6. The court also noted several other reasons why the statute of limitations does not apply to the government's effort to collect the $20,000 in royalties. *Id.* at *6–*11. Accordingly, it held that the government's counterclaim is not barred. Samedan appeals the District Court's decision on the statute of limitations issue.

## III. Analysis of Appellants' Challenges to the May 1993 Letter and the Assistant Secretary's Decision

### A. The May 1993 Letter and APA Notice–and–Comment Rulemaking

■ The APA defines an administrative rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy." 5 U.S.C. § 551(4). The statute further requires that any such rule must be implemented through the notice-and-comment procedures of § 553, which give "interested persons an opportunity to participate in the rule making." 5 U.S.C. § 553(c). IPAA and Samedan argue that the letter constituted an agency rule subject to these requirements.

By itself, the letter did not constitute a rulemaking requiring APA notice-and-comment procedures. As the District Court found, "[n]othing in DOI's procedures vests authority in the Associate Director of MMS [the letter's author], or even the Director, to issue proclamations binding on the agency. The court can not and will not invent such authority." *IPAA*, 1995 WL 431305 at *4. Quite simply, the May 1993 letter is not an "agency statement" with "future effect" since it did not bind the agency in any way.[2]

---

2. The District Court held that, even if the letter constituted an APA rule, notice-and-comment rulemaking was not required because the letter would qualify as an interpretative rule. *IPAA*, 1995 WL 431305 at *4–*6. Interpretative rules

and general statements of agency policy are exempt from notice-and-comment requirements. 5 U.S.C. § 553(b)(A). Because of our holding that the letter does not constitute a rule at all, we find it unnecessary to consider whether it would qual-

Arguing that the letter constituted a rule subject to APA notice-and-comment requirements, appellants stress the test we set forth in *American Mining Congress v. Mine Safety and Health Admin.*, 995 F.2d 1106, 1112 (D.C.Cir.1993), for distinguishing between substantive rules and interpretative rules. We held there that if a rule "effectively amends a prior legislative rule," it is a rule with "legal effect" subject to notice-and-comment requirements. Appellants contend that the letter altered DOI's past practice of excluding take-or-pay settlement payments from gross proceeds. However, even if appellants are correct in their claim that the royalty computation system in the letter departed substantially from a prior legislative rule, the letter would not itself constitute a "rule" subject to notice-and-comment requirements. *Id.* The letter is not an agency rule at all, legislative *or* interpretative, because it does not purport to, nor is it capable of, binding the agency. However, appellants' arguments about DOI's past practice with regard to take-or-pay settlements are relevant to our evaluation of the Assistant Secretary's decision in the *Samedan* case, and we will consider them as we now turn to appellants' challenges to that decision.

### B. The Assistant Secretary's Decision
#### 1. Standard of Review

■ We review actions of administrative agencies under the arbitrary and capricious standard of the APA, 5 U.S.C. § 706(2)(A). As we noted earlier, in our review we defer to an agency's reasonable interpretation of a statute it is entrusted to administer so long as it is not inconsistent with the unambiguously expressed congressional intent. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). As the District Court noted, "[d]eference is even more clearly in order when an agency interprets its own administrative regulations." *IPAA*, 1995 WL 431305 at *6 (citing *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). The relevant statutes in this case provide that royalties shall be based on the "amount or value of

the production" saved, removed, or sold by the lessee. *See* OCSLA, 43 U.S.C. § 1337(a)(1); MLA, 30 U.S.C. § 226; 25 C.F.R. § 211.13 (tribal leases); 25 C.F.R. § 212.16 (Indian allotted land leases). The relevant regulation is the gross proceeds rule.

■ Appellants argue that normal administrative law standards do not apply in this case. They claim, as they did in the District Court, that Assistant Secretary Deer's decision does not actually interpret statutes and agency rules, but instead interprets the Fifth Circuit's decision in *Diamond Shamrock*, which, they contend, has already addressed the controversy at issue in this case. They argue that DOI's "reinterpretation" of *Diamond Shamrock* is problematic because DOI has already amended its regulations to comply with *Diamond Shamrock*. *See supra* at 1253 (citing Revision of Gross Proceeds Definition in Oil and Gas Valuation Regulations, 53 Fed.Reg. 45,082, 45,084, 45,083 (Nov. 8, 1988)). Thus, they claim, the agency is bound by its own hand—it is its own acquiescence in *Diamond Shamrock* that bars it from "reinterpreting" that decision. Because the court, and not an administrative agency, is the proper place for construing past judicial decisions, appellants contend that we should not defer to DOI's interpretations. By implication, we would also not afford the Assistant Secretary's decision the benefit of the APA's arbitrary and capricious standard, as *Diamond Shamrock* has already determined the outcome of the APA analysis.

Appellants cite in support of their claim that we should not defer to DOI's interpretation of *Diamond Shamrock* the United States Supreme Court's statement that "[o]nce we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis,* and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning." *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 131, 110 S.Ct. 2759, 2768, 111 L.Ed.2d 94 (1990). But *Diamond Shamrock* is not *stare decisis* in this case. *Diamond Shamrock* is

---

ify for the interpretative rule exception if it *were* a rule.

deserving of respect as a decision of a sister circuit, but it is not binding authority on us. The cited language from *Maislin* is therefore not on point.

 This is not to say that the agency's acquiescence in the Fifth Circuit's decision is irrelevant or unimportant. Under *Chevron*, DOI's interpretation of the gross proceeds rule is held only to a standard of reasonableness, but the interpretation must be reasonable *in light of DOI's adoption of Diamond Shamrock.* Under APA § 706(2)(A) review, the Assistant Secretary's decision must satisfy the arbitrary and capricious standard insofar as it treats contract settlement payments differently from the way it treats take-or-pay payments under *Diamond Shamrock.* An agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so. *See National Association of Broadcasters v. FCC,* 740 F.2d 1190, 1201 (D.C.Cir.1984) (stating that the agency could not depart from its conclusion in a prior decision without reasoned explanation).

 As we have noted in the past, *"Chevron* review and arbitrary and capricious review overlap at the margins." *Arent v. Shalala,* 70 F.3d 610, 615 (D.C.Cir.1995); *National Ass'n of Regulatory Util. Comm'rs v. ICC,* 41 F.3d 721, 728 (D.C.Cir.1994). The instant case falls within that overlap. A determination that DOI has acted inconsistently with its adoption of *Diamond Shamrock* could be phrased as a conclusion that the agency's interpretation *is unreasonable* in light of its adoption of the Fifth Circuit's decision or that the agency had acted *arbitrarily* in treating take-or-pay settlement payments differently from take-or-pay payments, which are governed by the agency's adoption of *Diamond Shamrock.* The two analytic frameworks in this case produce the same result. Because the question at the root of the analysis is whether DOI has treated the two types of payments differently, the arbitrary and capricious analytic framework is the most apt. However, we stress that, within the boundaries of this case, a determination that the Assistant Secretary's decision is arbitrary and capricious in light of DOI's adoption of *Diamond Shamrock* is functionally equivalent to a de-

termination that DOI's interpretation of the gross proceeds rule is unreasonable under *Chevron.* That is, in this case, if DOI's interpretation of the gross proceeds rule is unreasonable, it is unreasonable because the application of that interpretation in the case of take-or-pay settlement payments constitutes an unexplained departure from the agency's adoption of *Diamond Shamrock. See National Association of Broadcasters,* 740 F.2d at 1201.

Amicus the Jicarilla Apache Tribe also argues for a standard of review different from the administrative law standards we normally apply. According to the Tribe, we are to review the Assistant Secretary's decision not under the arbitrary and capricious standard, but under the rigorous standard of a fiduciary duty owed by DOI to Indian tribes who are leasing Indian lands. Among other things, the Tribe relies on a Tenth Circuit opinion which states that this fiduciary duty to Indian oil and gas lessors requires that DOI's "actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary." *Jicarilla Apache Tribe v. Supron Energy Corp.,* 728 F.2d 1555, 1563 (10th Cir.1984) (Seymour, J., concurring in part and dissenting in part), *adopted as majority en banc opinion,* 782 F.2d 855, 857 (10th Cir.), *cert. denied,* 479 U.S. 970, 107 S.Ct. 471, 93 L.Ed.2d 416 (1986). We find it unnecessary to consider the Tribe's fiduciary duty argument. Even if the Assistant Secretary's decision should be subject to this standard, it must also pass the APA's arbitrary and capricious test. Because we conclude below that the decision fails to meet the arbitrary and capricious test, we need not reach the fiduciary duty issue.

We now proceed to examine the Assistant Secretary's decision under the APA's arbitrary and capricious standard of review.

### 2. Analysis

 We must decide whether it was arbitrary and capricious for DOI to conclude that take-or-pay *settlement payments* are royalty bearing in light of its determination (following *Diamond Shamrock*) that take-or-pay *payments* themselves are not royalty bearing

until those payments are specifically allocated to gas that is physically severed from the ground. We conclude that DOI has failed to give a sufficient nonarbitrary reason for treating the two types of payments differently.

We begin our analysis with an examination of the basis for the holding in *Diamond Shamrock*. The Fifth Circuit placed heavy emphasis on the necessary link between royalties and actual production of gas, finding it "obvious" from the relevant statutes, regulations and lease provisions that royalties "are not due on 'value' or even 'market value' in the abstract, but only on the value of *production saved, removed or sold* from the leased property." *Diamond Shamrock*, 853 F.2d at 1165. Similarly, the court determined that the gross proceeds rule applies "only to gross proceeds that accrue to the lessee from the disposition or sale of *produced substances*, that is, gas actually removed and delivered to the pipeline." *Id.*

DOI argues that the required connection between royalties and physical severance must be temporal only; that is, royalties on payments accrue *when* gas is produced, regardless of whether those payments came from the purchaser of the gas. But this reading does not account for *Diamond Shamrock*'s emphasis on the link between royalties and physical severance. Under *Diamond Shamrock*, at the time of a settlement payment or a take-or-pay payment, no production has occurred; therefore no royalties accrue. But when make-up gas is taken, a portion of the take-or-pay payment is *credited as payment for* the make-up gas. It is therefore reasonable to collect royalties on these funds, which have just been transformed into *payments for gas produced*.

That is what the Fifth Circuit relied upon in its *Diamond Shamrock* decision—the existence of a direct link between the funds upon which royalties are imposed and the physical severance of gas. This is how DOI read *Diamond Shamrock* when it revised its royalty regulations in 1988. In describing the *Diamond Shamrock* holding, DOI quoted from the court's introduction to the case, inserting the bracketed material: "the court ruled that '... royalty payments are not due

on take-or-pay payments and are only due on gas actually produced and taken [*i.e.*, so-called "make-up" gas].'" Revision of Gross Proceeds Definition in Oil and Gas Valuation Regulations, 53 Fed.Reg. 45,082, 45,082 (November 8, 1988). DOI thus demonstrated that it understood *Diamond Shamrock* to be saying that royalties would only be due on take-or-pay type payments when those payments were recouped. Two sentences later in its revision order, DOI quoted from the court's conclusion with the bracketed insertion: "No royalty is due on take-or-pay payments unless and until gas [namely, make-up gas] is actually produced and taken." *Id.* at 45,083. This insertion emphasizes that DOI read *Diamond Shamrock* in 1988 as we read it today. This fact is important because, as we noted in the previous subsection, it is the *agency's adoption and application* of *Diamond Shamrock* that is the relevant consideration. DOI cites another Fifth Circuit case, *Frey v. Amoco Production Co.*, 943 F.2d 578 (5th Cir.1991), *vacated for review by Louisiana Supreme Court*, 951 F.2d 67, *Part IIA reinstated*, 976 F.2d 242 (5th Cir.1992), in an attempt to demonstrate that even the Fifth Circuit reads *Diamond Shamrock* more narrowly than appellants. In *Frey*, the Fifth Circuit held that royalties are owed on contract settlement payments. However, *Frey* is inapposite. In that decision, the Fifth Circuit distinguished *Diamond Shamrock* not on the basis of any functional difference between take-or-pay payments and settlement payments, but on the grounds that *Frey* involved different lease language to be construed not under federal law but under Louisiana law. *Frey*, 943 F.2d at 581.

Under *Diamond Shamrock*'s construction of the royalties statute as requiring a link between payments subject to royalty and the physical severance of gas, there is no meaningful distinction between a settlement payment and a recoupable take-or-pay payment in that no gas is actually produced in either case. But unlike the recoupable take-or-pay payment, a nonrecoupable settlement payment is *never* credited as payment for any gas actually severed from the ground. When gas is actually severed and sold to a substitute purchaser, the settlement payment does

not serve as payment for the gas. The link between the funds on which royalties are claimed and the actual production of gas is missing.

It is possible to argue, of course, that DOI merely adopted the holding in *Diamond Shamrock* but not the reasoning of the opinion. Under this scenario, DOI could collect royalties on settlement payments because *Diamond Shamrock* did not address settlement payments. The problem with this line of reasoning is that, as we have already explained, DOI has read *Diamond Shamrock* as requiring a link between royalty-bearing payments and severed gas and has regulated accordingly. An agency cannot meet the arbitrary and capricious test by treating type A cases differently from similarly situated type B cases because a court once decided a type A case against the agency where the rationale of the court decision applies to both. The treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent. That is the very meaning of the arbitrary and capricious standard.[3]

Take-or-pay payments and contract settlement payments are functionally indistinguishable with respect to the calculation of royalties. Both types of payments satisfy outstanding take-or-pay obligations, and both types can be recoupable or nonrecoupable. The only difference is whether the payments follow negotiations between the parties over the cancellation of contractual obligations. We see no way in which the occurrence of these negotiations changes the functional nature of the payments for royalty purposes. The relevant question in both cases, under *Diamond Shamrock*, is whether or not the funds making up the payment actually pay for any gas severed from the ground. When take-or-pay payments (or settlement payments) are recouped, those funds do pay for severed gas. But when the payments (of either variety) are nonrecoupable, the funds are never linked to any severed gas.[4] Therefore, no royalties accrue on those payments.

Under the preceding analysis, we find Assistant Secretary Deer's decision in *Samedan Oil Corp.* arbitrary and capricious in light of DOI's adoption of the *Diamond Shamrock* holding. Neither take-or-pay payments nor take-or-pay settlement payments are royalty bearing unless and until they are credited toward the purchase of make-up gas.

## IV. Conclusion

Having reviewed Assistant Secretary Deer's decision in *Samedan Oil Corp.* and found it to be arbitrary and capricious in light of DOI's acquiescence in the Fifth Circuit's decision in *Diamond Shamrock*, we reverse the District Court's granting of summary judgment against appellants and hold that DOI is precluded from collecting royalties on the $100,000 settlement payment made by Southern to Samedan. Because we conclude that DOI cannot collect any royalties on the settlement payment, it is unnecessary for us to consider appellant Samedan's statute of limitations claim.

ROGERS, Circuit Judge, dissenting:

The court concludes that the Secretary of the Interior adopted an impermissible interpretation of his regulations when he determined that contract buy-out payments and settlements of accrued take-or-pay liabilities are among the "gross proceeds" received by a lessee for gas production. The court relies

---

3. We do not by this reasoning dispute the dissent's proposition that agencies have the power of nonacquiescence in decisions of a single circuit. Dissent at p. 1261 & n. 3 & n. 4. That proposition is simply inapplicable here. The Secretary did not refuse to acquiesce in *Diamond Shamrock*, but instead amended the applicable regulations with accompanying explanations adopting and interpreting *Diamond Shamrock*. While free to refuse acquiescence, the Secretary is not free, for the reasons set forth in the text, to adopt the *Diamond Shamrock* rule for some purposes but arbitrarily and capriciously reject it for others.

4. We do not understand our colleague's rejection of the proposition that *Diamond Shamrock* depends on recoupability. The portion of the *Diamond Shamrock* opinion quoted by our colleague on p. 8 expressly reflects that "no royalty is due on take-or-pay payments unless and until gas [namely, make-up gas] is actually produced and taken." Dissent at p. 1264. It is not clear to us how the production and taking of make-up gas could ever occur absent recoupability.

largely on *Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159 (5th Cir.1988), and the Secretary's acquiescence in the *Diamond Shamrock* holding, *Revision of Gross Proceeds Definition in Oil and Gas Valuation Regulations,* 53 Fed.Reg. 45,082 (1988) (*Gross Proceeds Revision*). To the contrary, the Secretary made clear in responding to *Diamond Shamrock* that the regulations were changed only to the extent of requiring that actual severance of gas from the earth must occur before royalties are due on any revenue. Because the challenged interpretations in these consolidated cases assess royalties only after such severance occurs, there is no inconsistency between the Secretary's position and his acquiescence in *Diamond Shamrock.* Accordingly, I respectfully dissent.

## I.

A preliminary, but critical, issue in these cases is the proper standard of review. Ordinarily, the Secretary is entitled to considerable deference in interpreting both the statutes[1] at issue here, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), and the regulations[2] adopted to implement the statutes, *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). In theory, the court recognizes that the such deference is appropriate in the instant cases. Op. at 1258. In practice, however, the court effectively changes the issue from whether the Secretary's interpretations of the statutes and regulations are permissible to whether the interpretations accord with the rationale of *Diamond Shamrock.* This subtle change in approach misconceives the nature of the Secretary's acquiescence in *Diamond Shamrock.*

The Secretary was not bound to accept the holding of *Diamond Shamrock,* at least in cases reviewable in courts outside the Fifth Circuit. Even after one circuit has disagreed with its position, an agency is entitled to maintain its independent assessment of the dictates of the statutes and regulations it is charged with administering, in the hope that other circuits, the Supreme Court, or Congress will ultimately uphold the agency's position.[3] *See United States v. Mendoza,* 464 U.S. 154, 160, 104 S.Ct. 568, 572, 78 L.Ed.2d 379 (1984); *see also American Tel. & Tel. Co. v. FCC,* 978 F.2d 727, 737 (D.C.Cir.1992) (referring to agency's "right to refuse to acquiesce" in decisions of circuit courts), *cert. denied,* 509 U.S. 913, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993). While some courts, including this one, have criticized agencies that refuse to apply the settled law of the circuit that will review the agency's action in a particular case, intercircuit nonacquiescence is permissible, especially when the law is unsettled.[4] Nor can there be any doubt that the law involved in *Diamond Shamrock* is unsettled; courts and commentators are sharply divided over a host of questions involving the application of gas leases to take-or-pay payments and settlements, and even the most general issues regarding how to interpret royalty clauses continue to divide the authorities.[5] *See generally* John S.

---

**1.** Indian Mineral Leasing Act, 25 U.S.C. §§ 396, 396d (1994); Mineral Leasing Act, 30 U.S.C. § 226 (1994); Outer Continental Shelf Lands Act, 43 U.S.C. § 1337(a) (1994).

**2.** 30 C.F.R. §§ 206.150–.159 (1995).

**3.** Commentators have pointed out various benefits of intercircuit nonacquiescence. *See* Samuel Estreicher and Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies,* 98 YALE L.J. 679, 736–37 (1989).

**4.** *Cf. Johnson v. United States R.R. Retirement Bd.,* 969 F.2d 1082, 1090–93 (D.C.Cir.1992), *cert. denied,* 507 U.S. 1029, 113 S.Ct. 1842, 123 L.Ed.2d 467 (1993); *id.* at 1097–98 (Buckley, J., dissenting in part); *Yellow Taxi Co. v. NLRB,* 721 F.2d 366, 383 & n. 39 (D.C.Cir.1983) (opinion of

MacKinnon, J.); *id.* at 384–85 (Wright, J., concurring); *id.* at 385 (Bork, J., concurring).

**5.** *Compare Tara Petroleum Corp. v. Hughey,* 630 P.2d 1269, 1272–74 (Okla.1981) *with Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 871 (Tex. 1968). Commentators are divided on whether royalties should be due on take-or-pay settlement payments. *Compare* Patricia A. Brown, Note, *Klein v. Jones: Equitable Right to Royalties on Take–or–Pay Settlements,* 47 ARK. L.REV. 749, 784–86 (1994) *and* Kirk J. Bily, Comment, *Royalty on Take–or–Pay Payments and Related Consideration Accruing to Producers,* 27 HOUS. L.REV. 105, 133–35 (1990) (yes) *with* Beverly M. Barrett, Note, *Roye Realty v. Watson: Are Royalties Owed on all Take–or–Pay Settlements in Oklahoma?,* 46 OKLA. L.REV. 745, 762–64 (1993) *and* Angela Jeanne

Lowe, *Defining the Royalty Obligation*, 49 SMU L.Rev. 223 (1996). Thus, the Secretary was under no obligation to adhere to the *Diamond Shamrock* holding, let alone its rationale or dicta, and the court should not review his actions for compliance with the language of that opinion.

The court concludes that the Secretary's interpretation "must be reasonable in light of DOI's adoption of *Diamond Shamrock*." Op. at 1258. Correctly understood, the Secretary's interpretation must be reasonable in light of the *regulations* he adopted after *Diamond Shamrock* was decided. Faced with an adverse decision from one circuit, the Secretary had discretion as to how to respond. Because the regulations were amended in response to *Diamond Shamrock*, that case will be persuasive authority as to the regulations' meaning. But what binds the Secretary is the amended regulations themselves, not the court decision that precipitated the amendment.

The Secretary is entitled to the great deference we usually accord to an agency's interpretation of its own regulations,[6] *S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1294 (D.C.Cir.1995), for his interpretation is not constrained by what the Fifth Circuit had to say. The Secretary must also have a coherent rationale for when royalties are assessed, to ensure that his decision is neither arbitrary nor capricious. 5 U.S.C. § 706(2)(A).

### II.

The court faults the Secretary for his purportedly inconsistent royalty treatment of take-or-pay payments and "functionally indistinguishable" take-or-pay settlement payments. Op. at 1260. The Secretary's treatment is not inconsistent, however, because he assesses royalties on both types of payment when the lessee produces the gas to which the payment is attributable.

At issue here are two of the types of settlement payments as were described in the "Dear Payor" letter of May 3, 1993, from the Minerals Management Service (MMS) to its lessees. Applying the principle that "lessees and other payors are required to pay royalties on contract settlement payments to the extent payments are attributable to minerals produced from the lease," the MMS examined four common types of settlement payments. "Past pricing disputes" relate to the amount owed for minerals produced or sold before the contract settlement, and such amounts are subject to royalty when the payment is made.[7] A "contract buydown" involves a payment made to reduce the price of gas to be taken in the future (after the settlement) by the original purchaser—"it is a payment of some amount now in return for paying a lower price later"—and such payments are royalty-bearing as future production occurs. Neither of these two types of payment is involved in the instant case. Rather, the Samedan–Southern agreement contains a "contract buyout" payment ($89,-706) and a payment made in settlement of accrued but unpaid take-or-pay liabilities ($10,294). The "buyout" payment extinguishes the purchaser's obligation to take any gas in the future, and is royalty-bearing because it "compensates the lessee for lower prices in the future for the production foregone by the original purchaser." Under an attribution formula, the amount of the buyout payment attributable to each unit of gas freed up for

Crowder, Comment, *Take-or-Pay Payments and Settlements—Does the Landowner Share?*, 49 La. L.Rev. 921, 935– 37 (1989) (no).

**6.** Appellants contend that no deference should be due to an agency's interpretation of its own regulation when it will affect contracts to which the agency is a party, relying on dictum in a previous opinion. *See Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 614 (D.C.Cir.1992) (leaving open whether to accord *Chevron* deference to the interpretation of a statute that affected agreements to which the agency was a party). This contention is incorrect because Congress has authorized the Secre-

tary to prescribe regulations governing mineral leases. 25 U.S.C. § 396 (allotted Indian lands, applicable to Samedan); *see also id.* § 396d (tribal Indian lands); 43 U.S.C. § 1334(a) (offshore leases); 30 U.S.C. § 189 (onshore leases); *see California Co. v. Udall*, 296 F.2d 384, 388 (D.C.Cir.1961) (deferring to Secretary's reasonable construction of 30 U.S.C. § 226 because Secretary has duty of administering the statute).

**7.** Appellants have conceded that amounts paid to resolve disputes over the price of past production are royalty bearing.

the remaining term of the original take-or-pay contract is added to the proceeds received from the substitute purchaser, and these gross proceeds are royalty-bearing as production occurs. Finally, payments in settlement of accrued take-or-pay liabilities are royalty-bearing, at the time of production, as attributed to each unit of gas up to the volume of what would have been make-up gas, for the remaining term of the make-up period under the original contract.

An examination of the regulatory scheme reveals why the Secretary's extraction-plus-attribution principle is permissible. Congress delegated broad authority to the Secretary to ensure that royalties are paid on the full "value of the production removed or sold from the lease." 30 U.S.C. § 226(b)(1)(A); *see also* 43 U.S.C. § 1337(a)(1)(A) (for Outer Continental Shelf leases, "value of the production saved, removed, or sold").[8] The Secretary, in turn, has adopted a market-based approach to determining the value of each unit of gas that is produced. The market "and its reliance on self-motivated individuals to engage in transactions which are to their own best interest, therefore, is a cornerstone of the regulations." *Revision of Gas Royalty Valuation Regulation and Related Topics*, 53 Fed.Reg. 1230, 1233 (1988) (*Gas Royalty Revision*). The value of gas production is generally "determined by prices set by individuals of opposing economic interests transacting business between themselves." *Id.*

At the same time, the Secretary has recognized that the benefits conferred on producers in the natural-gas market may not all be denominated in the same fashion. The regulations have therefore imposed royalties on a broad range of payments received by lessees in connection with gas.[9] Before 1988, the regulations specified that the "value" must be at least the "gross proceeds accruing to the lessee from the sale of" gas, but did not further define "gross proceeds." 30 C.F.R. §§ 206.103, 206.150 (1987). The 1988 overhaul of the regulations continued the same basic approach, prescribing that "under no circumstances shall the value of production for royalty purposes be less than the gross proceeds accruing to the lessee for lease production," 30 C.F.R. § 206.152(h) (1988) (unprocessed gas); *id.* § 205.153(h) (unprocessed gas),[10] but the new rules explicitly defined "gross proceeds" to mean "the total monies and other consideration accruing to an oil and gas lessee for the disposition of unprocessed gas, residue gas, or gas plant products." *Id.* § 206.151. As MMS explained, it "purposefully drafted the gross proceeds definition to be expansive and thus include all types of consideration flowing from the buyer to the seller." *Gas Royalty Revision*, 53 Fed.Reg. at 1241. This expansive definition was necessary because otherwise the Secretary's general acceptance of arm's-length contracts as evidence of the value of gas might overlook the total value of the gas to the lessee:

> [T]here must be exceptions to the general rule that the lessee's arm's-length contract price should be accepted without question as the value for royalty purposes. Once such situation is where the contract does not reflect all of the consideration flowing either directly or indirectly from the buyer to the seller.

*Id.* at 1247. At a time when the economics of gas production were rapidly changing and contractual innovations were beginning to ap-

---

**8.** The statutory authority to charge royalties on Indian lands is even broader, as royalties are not required to be tied to "production." 25 U.S.C. §§ 396 (allotted lands), 396d (tribal lands). However, the Secretary has adopted the formula "value . . . produced and saved from the land leased" for leases on Indian lands. 25 C.F.R. §§ 211.13(a) (tribal lands), 212.16 (allotted lands). Samedan's lease is on allotted Indian lands, so 25 C.F.R. § 212.16 is the regulation applicable to Samedan's lease.

**9.** *See, e.g., Enron Oil & Gas Co. v. Lujan*, 978 F.2d 212, 215–17 (5th Cir.1992) (upholding Secretary's "long-standing method of including state severance tax reimbursements in the calculation of 'gross proceeds' "), *cert. denied*, 510 U.S. 813, 114 S.Ct. 59, 126 L.Ed.2d 29 (1993); *Mesa Operating Ltd. Partnership v. U.S. Department of Interior*, 931 F.2d 318, 324 (5th Cir.1991) (upholding Secretary's assessment of royalties on reimbursed gas treatment costs), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 934, 117 L.Ed.2d 106 (1992).

**10.** Samedan produces unprocessed gas, so 30 C.F.R. § 206.152(h) (1995) is the applicable regulation.

pear, therefore, the Secretary made it clear that he would examine the dealings of producers and purchasers carefully to ensure that all of the value received by producers was subjected to royalties. In the definition of "gross proceeds," he included many examples of payments that would be subject to royalties; among those examples were take-or-pay payments and advance payments to cover exploration or development costs. 30 C.F.R. § 206.151 (1988).

As a necessary adjunct to his reliance on arm's-length contracts as indicators of gas value, the Secretary required producers to be reasonably diligent in enforcing their contractual rights against purchasers. On an issue that generated considerable comment during the rulemaking, *Gas Royalty Revision*, 53 Fed.Reg. at 1240–41, the Secretary concluded: "Monies and other consideration ... to which a lessee is contractually or legally entitled but which it does not seek to collect through reasonable efforts are also part of gross proceeds." 30 C.F.R. § 206.151 (1988); *see also id.* § 206.152(j). Thus, producers who failed to enforce their rights under lucrative take-or-pay contracts were on notice that they could be liable for royalties on the contract price.

Shortly after the revised regulations were promulgated, the Fifth Circuit decided *Diamond Shamrock*. The Secretary's reaction to that case was brief and quite clear. *Diamond Shamrock*, said the Secretary, interpreted the phrase "value of production" to require that actual severance of gas from the earth must occur before any royalty could be due. The crux of the decision, to which the Secretary announced his acquiescence, was that

> [t]he Court adopted as the legal definition of the word "production," as used in the context of calculating royalty payments, the actual physical severance of minerals from the formation. Accordingly, the Court concluded that "royalty payments are due only on the value of minerals actually produced, i.e., physically severed from the ground. No royalty is due on take-or-pay payments unless and until gas [namely, make-up gas] is actually produced and taken."

*Gross Proceeds Revision*, 53 Fed.Reg. at 45,082–083 (quoting *Diamond Shamrock*, 853 F.2d at 1168). Although the court is not reviewing the merits of the Secretary's reading of *Diamond Shamrock*, his view was reasonable; the Fifth Circuit itself has twice distinguished *Diamond Shamrock* by characterizing its *ratio decidendi* as depending on the definition of "production." *Frey v. Amoco Prod. Co.*, 943 F.2d 578, 581–82, 584 & n. 5 (5th Cir.1991) (*Frey I*), *vacated in part*, 951 F.2d 67, 68 (5th Cir.1992), *reinstated*, 976 F.2d 242 (5th Cir.1992); *Mesa Operating Ltd. Partnership v. U.S. Department of Interior*, 931 F.2d 318, 326 (5th Cir.1991) (Brown, J.), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 934, 117 L.Ed.2d 106 (1992). More important in light of the court's reading of the Secretary's reading of *Diamond Shamrock*, no reported decision has described that case's reasoning as depending at all on the recoupability of take-or-pay payments.

Out of the major regulatory revisions adopted earlier that year following a lengthy rulemaking, the Secretary identified the only two provisions that were incompatible with the newly accepted definition of "production," and he excised those provisions from the regulations. *Gross Proceeds Revision*, 53 Fed.Reg. at 45,083. Nothing else was touched. Emphasizing the limited nature of the amendments, the Secretary noted in the final rule itself that the amendments were "the minimum necessitated by" *Diamond Shamrock*, and reasserted his intention that "product value regulations will be premised on the concept that royalty value cannot be less than the gross proceeds accruing to the lessee." *Id.* at 45,084. There was no mention of nonrecoupable take-or-pay payments or of take-or-pay settlement payments—not surprisingly, because *Diamond Shamrock* was silent on these subjects. Although the court places great interpretative weight on the Secretary's bracketed inclusion of the words "make-up gas," Op. at 1259, the Secretary referred to "make-up gas" in the context of the *Diamond Shamrock* holding: for recoupable take-or-pay payments, the time of extraction is when the purchaser takes make-up gas.

Contrary to this court's reading, therefore, neither *Diamond Shamrock* nor the *Gross Proceeds Revision* adopted a requirement that payments be recouped before a royalty could be assessed. Op. at 1259. Rather, it was clear in 1988 that the only change in the regulations—"the minimum necessitated"— was that all revenues that had previously been royalty-bearing would no longer be subjected to a royalty assessment until actual extraction of gas occurred. It follows that the Secretary's decision in the instant cases is consistent with the text of the post-*Diamond Shamrock* amendment, because all royalty assessments were triggered by actual extraction.

The Secretary's challenged actions are also consistent with the rationale of the amended regulations as a whole. The definition of "gross proceeds" includes revenue to which a lessee is contractually entitled but does not seek to collect through reasonable efforts. 30 C.F.R. § 206.151 (1995). The regulations, both before and after *Diamond Shamrock*, also account for the possibility that the most reasonable way to collect contractual entitlements may be through settlement. "Value shall be based on the highest price a prudent lessee can receive through legally enforceable claims under its contract." 30 C.F.R. § 206.152(j) (1995). Given the unforeseen circumstances that made the contract so uneconomical for Southern, Samedan's decision to settle at a discount was a prudent course of action. MMS, acting in accordance with the logic of § 206.152(j), recognized this by charging a royalty on the prudent settlement value, rather than on the full face value of the contract. By waiting until extraction occurred, MMS also adhered to the Secretary's acceptance of *Diamond Shamrock*'s definition of "production." The challenged actions are no more than a straightforward application of the regulations: assessing a royalty payment on the settlement of legally enforceable claims, but only after the gas to which those claims pertain has been extracted from the ground.

## III.

The court reads the Secretary's references to make-up gas in his discussion of the royalty treatment of recoupable take-or-pay payments in *Gross Proceeds Revision*, 53 Fed. Reg. at 45,082–83, as indicating that the Secretary believed that royalties could be assessed on take-or-pay payments only because the payments were later recouped by the original purchaser. Op. at 1259–60. With respect to a take-or-pay payment, however, *two* things happen when make-up gas is taken: gas is extracted; and the take-or-pay payment is recouped. Thus, in noting that such take-or-pay payments would not be royalty-bearing until make-up gas was taken, the Secretary could have identified as a *sine qua non* either extraction or recoupment. Given that the *Gross Proceeds Revision* does not mention recoupability at all, and that the references to make-up gas occur in the context of explaining *Diamond Shamrock*'s definition of "production" to mean "extraction," the most natural reading is that it was extraction, and not recoupment, that the Secretary viewed as triggering the royalty obligation.

The court contends that, without recoupability, there is no "direct link between the funds upon which royalties are imposed and the physical severance of gas." Op. at 1259. That link is provided, however, by the Secretary's attribution principle. In the case of a buyout payment, the Secretary determines the amount of gas for which the settling purchaser had a take-or-pay obligation and attributes the proceeds from the buyout payment to the gas that the lessee would not have been able to sell without the settlement—the "freed-up gas." [11] For the settle-

---

11. Not only are there technological and sometimes contractual or legal constraints on increases in the volume of production, but take-or-pay contracts typically set aside a certain percentage of the lessee's deliverability. In Southern's take-or-pay contract with Samedan, for example, Southern promised to take or pay for 85 percent of deliverability each year. By limiting the attribution of payments for accrued take-or-pay liabilities to the original make-up period, the Secretary avoids the problem of demanding royalties when the original purchaser would have been unable to take its entire make-up rights. For example, Hadson and TransOk were able to

ment payments for accrued take-or-pay liabilities, the Secretary determines the amount of gas under the settling purchaser's accrued make-up rights and attributes the proceeds from that portion of the settlement payment to the additional gas that the lessee sells beyond the take-or-pay obligation in the original contract—the "would-have-been make-up gas." In each case, the Secretary waits to assess the royalties until the time of extraction and establishes a link between the proceeds from the settlement payment and the gas produced.

Any sensible royalty system must recognize, as the Secretary's system does, that gas production will go on after the take-or-pay crisis has been resolved. Before the crisis, when take-or-pay contracts were routinely negotiated, it was reasonably assumed that the pipelines would eventually take all of the make-up volumes to which they were entitled. Thus, in an ongoing take-or-pay contract, the *Diamond Shamrock* rule affects only the timing of the royalty payment, not the amount of royalty due. Although the lessor could not charge a royalty when the lessee received the take-or-pay payment, the lessor eventually received a royalty on the full proceeds received by the lessee when the make-up gas was taken. When an extreme drop in spot market prices was coupled with the deregulation of wellhead sales, the elimination of pipelines' minimum bills and the implementation of open-access transportation, however, pipelines were threatened with bankruptcy if they continued to meet their take-or-pay obligations. *See United Distribution Companies v. FERC,* 88 F.3d 1105 (D.C.Cir.1996). Under those circumstances, it made sense for producers to accept contract buyouts needed to keep their pipeline customers solvent. But production went on, at much reduced prices. There is no logical reason to treat the take-or-pay settlements any differently from take-or-pay payments

that would have been made by pipelines that fully performed under the contracts, for the settlements are simply replacements (at a discount) for forgone take-or-pay payments and high contract prices. Just as the lessor would have received at the time of production a royalty on the full contract price of make-up gas, which would have been paid for by an earlier take-or-pay payment, it should receive a royalty on the full contract price of would-have-been make-up gas, less a reasonable discount, which is paid for in part by the contract settlement. The Secretary's approach is not only permissible but eminently sensible.

By recognizing the estimates of value in the settlement agreement between Southern and Samedan, the Secretary adhered to his general approach of allowing the market to determine the value of production. When the arm's-length take-or-pay contract was first entered into, it represented the market's estimation of the value of contemplated future production. Even after the price of gas on the spot market declined, the gas subject to the contract had a higher value for Samedan because of the existence of the take-or-pay contract with Southern. The decline of the market, however, did reduce the market value of the gas under the contract at the time of settlement below the face value of the contract, because it introduced uncertainty as to Southern's ability to continue performing. Southern and Samedan therefore freely negotiated a settlement payment that reflected their estimation of how far the value of Samedan's future production had fallen. Consistent with his view that "[v]alue ... is determined by prices set by individuals of opposing economic interests transacting business between themselves," *Gas Royalty Revision,* 53 Fed.Reg. at 1233, the Secretary accepted Southern's and Samedan's estimate.[12]

make up the entire amount of Southern's accrued take-or-pay liabilities in less than three months.

**12.** Moreover, a contrary royalty rule would distort the market incentives for the efficient settlement of uneconomical take-or-pay contracts. Exempting buy-out payments from royal-

ties would give the producer an incentive to settle such contracts at a greater than appropriate discount, to the detriment of a lessor who is unrepresented in the settlement negotiations. This distortion would occur because the producer would be willing to accept a below-market discount in return for the ability to exchange royalty-bearing rights under the original contract

The contrary arguments adopted by the district court in *In re Century Offshore Mgmt. Corp.*, 185 B.R. 734, 741 (E.D.Ky. 1995), *appeal pending*, No. 95–6320 (6th Cir.), a case involving a buyout payment, for why the Secretary's position is flawed, are unpersuasive. First, the court's concern that there would be two royalty payments for each sale of gas misapprehends the Secretary's attribution rule for determining the "gross proceeds" for each sale. Second, the court's claim that the purpose of the minimum-take requirements was to protect the lessee (and not the lessor) against the risks of development overlooks the fact that another purpose (which has become paramount by the time of settlement) was to protect both lessee and lessor against the risk that the market price would drop. Third, the court's claim that lessees might be barred from seeking refunds of royalty overpayments, *see* 43 U.S.C. § 1339, is mistaken because under the Secretary's extraction-and-attribution principle royalties are assessed only at the time of production. Finally, the court's claim that settlement payments are not part of the fair market value of production, *cf. Gas Royalty Revision*, 53 Fed.Reg. at 1233, ignores the fact that the settlement, like the sale of gas to the subsequent purchase, is an arm's-length market measure of the "value of production." It is unclear why only the lessee, and not the lessor, should benefit from that value.

Accordingly, I conclude that the Secretary's extraction-and-attribution principle is not only authorized by the regulations that he adopted in the wake of *Diamond Shamrock*, but also well-reasoned and applied consistently across-the-board to all types of take-or-pay and take-or-pay settlement payments.

## IV.

Previous administrative actions that appellants claim conflict with the Secretary's actions in the instant case in fact present no obstacle to the Secretary's position. *See* Op. at 1253. *Santa Fe Energy Co.*, MMS–85–0046–OCS (Ass't Sec'y Land & Minerals Mgmt. Oct. 14, 1988), decided only that royalties on recoupable take-or-pay payments and settlements of accrued take-or-pay liabilities were not due until make-up gas was taken. The decision, shortly after *Diamond Shamrock*, simply put the holding of that case into effect, and is entirely consistent with the Secretary's current position. *Santa Fe* did not speak to the question, which was not presented in that proceeding, whether a third-party purchase could substitute for make-up gas. Samedan's reliance on *Hunt Oil Co.*, MMS–87–0324–OCS (Dep. Ass't Sec'y Land & Minerals Mgmt. Jan. 25, 1989), is no more persuasive. In that proceeding, MMS was not permitted to charge royalties on the time value of advance payments for the development and production of gas (that is, the imputed interest from the time the advance payments were made until the time of production), even though royal-

---

for a royalty-free settlement payment. This is inconsistent with the lessee's duty toward the lessor to obtain the highest possible price. 30 C.F.R. § 206.152(j); *cf. Frey v. Amoco Prod. Co.*, 603 So.2d 166, 173–75 (La.1992) (*Frey II*); 5 EUGENE KUNTZ, TREATISE ON THE LAW OF OIL AND GAS § 60.3, at 137–38 (1991) ("[T]he lessee is required to exercise ... the degree of diligence that would be exercised by an ordinarily prudent operator having regard for the interests of both the lessor and the lessee."). As the Eighth Circuit observed, "The lessee's action has relinquished a valuable right and the lessor is entitled to receive something in return." *Klein v. Jones*, 980 F.2d 521, 531 (8th Cir.1992). The Secretary's position that buy-out payments are royalty-bearing

avoids the perverse incentives that would otherwise obtain.

A similar distortive effect would apply if the settlement of accrued take-or-pay liabilities were royalty-free. As the Assistant Secretary recognized, whether the original purchaser retains make-up rights on its take-or-pay settlement is a function of how much it is willing to pay as a settlement. Even under the analysis urged by appellants and accepted by the court, a recoupable take-or-pay settlement would be royalty-bearing when make-up gas was taken. Treating nonrecoupable settlements differently would distort the producer's decision-making and lead it to accept an uneconomically large discount on a nonrecoupable settlement.

ties were due, at the time of production, on the principal value of the advance payments. Whatever the merits of *Hunt*, the Secretary's actions are consistent with that decision because he does not assess a royalty on the time value of contract settlements (that is, the imputed interest from the time the settlement payments were made until the time of production).

The two other decisions that appellants cite, *Blackwood & Nichols Co.*, MMS–88–0008–O&G (Dir. MMS Apr. 20, 1989), and *Wolverine Exploration Co.*, MMS–88–0052–IND (Dep. Ass't Sec'y Indian Affairs (Operations) May 2, 1990), were both issued by officials who did not have the authority to make department-wide policy, or even to take final agency action subject to judicial review. *See* 30 C.F.R. §§ 243.3, 290.7 (1995); 43 C.F.R. § 4.21(c) (1995). Although both decisions were subject to further administrative appeal, they were not appealed. When *Samedan* reached the Assistant Secretary in 1993, she was therefore free to disagree with the prior decisions of lower-level officials. In any event, though, neither decision conflicts with the Secretary's actions in the instant case. *Blackwood & Nichols*, while quite cryptic, held that a certain nonrecoupable buyout payment was not royalty-bearing, but there is no indication in the record that the volumes to which the buyout payment was attributable were ever taken by a third party. Thus, the decision does not address the issue of the production of "would-have-been" make-up volumes. *Wolverine* involved a nonrecoupable settlement of accrued take-or-pay liabilities. There was no buyout of the contract, and the original purchaser contin-

ued to take gas under the take-or-pay provisions. The Deputy Assistant Secretary ruled that the payment was not royalty-bearing because it could not be credited against future purchases. The result in *Wolverine* does not conflict with the Secretary's assessment of royalties on Southern's payments in settlement of accrued take-or-pay liabilities because, as the Assistant Secretary in *Samedan* noted, the record does not show that the purchaser in *Wolverine* took additional gas above its minimum-take obligation. By contrast, Samedan concedes that its sales to Hadson exceeded the minimum-take amount in its original contract with Southern, so that under the Secretary's attribution policy royalties were assessed on that "would-have-been make-up gas" only.

## V.

The court does not reach Samedan's argument that the Secretary's counterclaim to enforce his order is partially time-barred because it finds that the order cannot be enforced in any case. Op. at 1260. Because I disagree with the court's holding on the validity of the Secretary's order, I address the statute of limitations issue and conclude that, as with the other issues raised by appellants,[13] Samedan's position is not meritorious.

Samedan contends that the Secretary's attempt to assess royalties is partly barred by the six-year limitations period created by 28 U.S.C. § 2415(a).[14] A brief review of the chronology is in order. After settling with Southern in December 1987, Samedan began producing the gas to which the Secretary later attributed the settlement payment. Production began in February 1988, and roy-

---

**13.** I join in Part II.A of the opinion of the court, Op. at 1256–57, holding that the "Dear Payor" letter of May 3, 1993, does not constitute a rulemaking requiring APA notice-and-comment procedures. In addition, because for reasons noted above in Part II of my dissent the letter did not "effectively amend[ ] a prior legislative rule" governing royalty assessments, *American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C.Cir.1993), the letter (if it were a rule at all) would be an "interpretative-rule" not subject to notice-and-comment procedures. 5 U.S.C. § 553(b)(A).

**14.** Section 2415(a) (1994) provides:

Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later. . . .

alties were due on the buyout portion of the settlement as production occurred until sometime in November 1989, when total sales reached the $89,706 buyout value. Royalties were due on the portion of the settlement for accrued take-or-pay liabilities as production occurred from May 1988 until sometime in July 1988, the period during which would-have-been make-up gas was taken, until those additional sales reached the $10,294 value for that portion of the settlement. There is no dispute that if the settlement is royalty-bearing at all, royalties became due on the last day of the month following production, which means that royalties on the settlement payment began to accrue in March 1988. On December 2, 1993—almost six years after royalties began to accrue— MMS ordered Samedan to pay a 20% royalty on the entire settlement. The order informed Samedan of its right to an administrative appeal. Samedan exercised that right, and the Assistant Secretary affirmed the MMS order on September 16, 1994. On October 3, 1994, Samedan sued to enjoin enforcement of the Assistant Secretary's order, and the Secretary filed a counterclaim on November 1, 1994, to enforce the order. On the date of the counterclaim, more than six years had passed since royalties had accrued on volumes produced through September 1988. Samedan therefore contends that the Secretary's counterclaim is time-barred with respect to those volumes.

The counterclaim is timely, however, because § 2415(a) permits the government to file a complaint within six years of the accrual of a right of action "or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later." The counterclaim was filed less than one year after both the initial MMS order and the Assistant Secretary's order on appeal. Samedan contends that the Secretary could have filed a judicial complaint without

having engaged in any administrative proceedings, so the proceedings that he actually provided were not "required by . . . law" and thus did not extend the period for filing suit. It is undisputed that *Samedan* was required to pursue its administrative appeal to the Assistant Secretary level before it could file judicial suit. 30 C.F.R. § 243.3; 43 C.F.R. § 4.21. Because the administrative proceedings were "required" before Samedan could sue, the Secretary also had a one-year period following their conclusion in which he could file his claim in court. *See Mesa Operating Ltd. Partnership v. U.S. Department of Interior,* 17 F.3d 1288, 1291–92 (10th Cir.1994); *United States v. California Care Corp.,* 709 F.2d 1241, 1247 (9th Cir.1983).[15]

Permitting the government to await the conclusion of administrative proceedings required of its adversary serves the purposes of the statute of limitations while simultaneously preserving the proper balance between the administrative and judicial processes. Were it otherwise, the Secretary would have had to file a "protective" suit to enforce the MMS order even as the order was under administrative review. Such a suit either would be a "sheer formality" having no substance during the pendency of the administrative review, or would result in a "short-circuit" of the administrative process. *United States v. General Elec., Inc.,* 556 F.Supp. 801, 805 (D.N.J.1983) (quoting *Crown Coat Front Co. v. United States,* 386 U.S. 503, 515, 87 S.Ct. 1177, 1184, 18 L.Ed.2d 256 (1967)); *United States v. International Ass'n of Firefighters,* 716 F.Supp. 656, 660 (D.D.C.1989). At least in the absence of any allegation of unreasonable delay by the Secretary in the administrative proceedings, forcing the Secretary into court before those proceedings have been completed would not serve the purposes of the statute of limitations. Transferring the dispute from the administrative process into district court would not improve the accuracy of fact-finding, provide repose to parties in Samedan's position, penalize the government for sleep-

---

**15.** *United States v. Cocoa Berkau, Inc.,* 990 F.2d 610, 615–16 (Fed.Cir.1993), cited by Samedan, is not to the contrary. There, the Federal Circuit held that an informal, discretionary process for administrative relief was not "required by law" because, among other things, the private party was not required to invoke and exhaust the process before bringing suit.

ing on its rights, or equalize the positions of the government and its private adversaries, which are the goals of § 2415. S.Rep. No. 1328, 89th Cong., 2d Sess. 2, 12, *reprinted in* 1966 U.S.C.C.A.N. 2502, 2503, 2513; *see General Elec.*, 556 F.Supp. at 805.[16]

Accordingly, I dissent and would affirm the judgment of the district court.

16. The district court rejected the statute of limitations defense for a number of other reasons as well: the counterclaim was not for "money damages" within the meaning of § 2415 because it sought performance of the lease agreement rather than monetary compensation for a breach; the administrative proceedings themselves did not constitute an "action" within § 2415, and once those proceedings were concluded, the government had a judicial claim to enforce the administrative order, rather than for money dam-ages on a contract; and the counterclaim was timely under § 2415(f), which provides that § 2415(a) shall not prevent the government from asserting a counterclaim "that arises from the same transaction or occurrence that is the subject matter of the opposing party's claim." Because the counterclaim was filed within one year of the final decision in the administrative proceedings, it is unnecessary to reach these alternative grounds.